851 F.2d 561
 57 USLW 2015, 48 Ed. Law Rep. 35
 Braden L. ALBERT, Francis J. Callard, Julie L. Jones, Gur
Melamede, Molly Mysliwiec, Demetri Orlando, Michelle
Paninos, Cathleen Perry, Amy Rozgonyi, Gregory Shin, Michael
Tilman, and Johnette Traill, Plaintiffs-Appellants,
v.
J. Martin CAROVANO, President of Hamilton College; Jane L.
Jervis, Dean of Students at Hamilton College; and
Hamilton College, Defendants-Appellees.
 No. 690, Docket 87-7111.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 28, 1988.
Decided June 28, 1988.
 
 Michael Krinsky, New York City (Terry Gross, Nicholas E. Poser, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, of counsel), for plaintiffs-appellants.
 Edward R. Conan, Syracuse, N.Y. (John A. Beach, Jonathan B. Fellows, Bond, Schoeneck & King, Syracuse, N.Y., of counsel), for defendants-appellees.
 Eugene D. Gulland, Elizabeth H. Gorman, Covington & Burling, Washington, D.C., Sheldon Elliot Steinbach, Gen. Counsel, American Council on Educ., Washington, D.C., for amicus curiae American Council on Educ.
 David M. Lascell, Marion Blankopf, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., Sandra McMullan, Nat. Institute of Independent Colleges and Universities, Washington, D.C., Elizabeth Van Nest, Com'n on Independent Colleges and Universities, Albany, N.Y., for amici curiae Nat. Institute of Independent Colleges and Universities and Com'n on Independent Colleges and Universities.
 Robert S. Smith, Stuart M. Cobert, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, John Mason Harding, Gen. Counsel, Columbia University, New York City, Walter J. Relihan, Jr., Gen. Counsel, Cornell University, Ithaca, N.Y., S. Andrew Schaffer, Vice President and Gen. Counsel, New York University, New York City, Dorothy K. Robinson, Gen. Counsel, Yale University, New Haven, Conn., for amici curiae Columbia University, Cornell University, New York University and Yale University.
 Before OAKES, MESKILL, NEWMAN, KEARSE, WINTER, PRATT, MINER, ALTIMARI and MAHONEY, Circuit Judges.
 
 ON REHEARING IN BANC
 
 1
 WINTER, Circuit Judge, with whom MESKILL, JON O. NEWMAN, KEARSE, PRATT, MINER, ALTIMARI and MAHONEY, Circuit Judges, join:
 
 
 2
 This appeal presents the question whether the disciplinary actions of a private college, by virtue of a state statute requiring colleges to adopt disciplinary rules and to file them with the state, constitute state action under the Constitution and 42 U.S.C. Sec. 1983 (1982). The appeal also requires us to address and to clarify the pleading requirements for claims brought under 42 U.S.C. Sec. 1981 (1982). Appellants are students who were suspended by Hamilton College on November 14, 1986 when they refused to end a three-day occupation of Hamilton's main administration building. On November 26, 1986, seeking injunctive relief under Section 1983, the suspended students brought this action in the Northern District of New York. Named as defendants were the College; its President, J. Martin Carovano; and its Dean of Students, Jane L. Jervis. The students' Section 1983 claim asserted that the College was a state actor because it had adopted disciplinary rules pursuant to N.Y.Educ.Law Sec. 6450 (McKinney 1985), the so-called Henderson Act, and had denied them due process when it suspended them pursuant to those rules. That Act directs all colleges and universities in the State of New York to adopt and to file with the state "rules and regulations for the maintenance of public order" that include as possible sanctions "suspension, expulsion or other appropriate disciplinary action." For their Section 1981 claim, appellants alleged that "[t]he defendants are selectively enforcing the College rules on student conduct against plaintiffs," among other reasons, "because of their criticisms of ... prejudice[ ] at Hamilton, ... and because they are black, Latin or gay; supportive of the rights of blacks, Latins and gays and without old family ties to Hamilton." Complaint p 35.
 
 
 3
 Appellants sought a preliminary injunction against their suspensions, and appellees moved to dismiss the complaint. After some hurried discovery, the district court on December 23 held an evidentiary hearing on the issue of state action. At the end of that hearing, Judge Cholakis, treating appellants' Section 1981 claim as arising under Section 1983, denied appellants' request for a preliminary injunction and dismissed their complaint on the ground that state action was lacking. The students appealed, and a divided panel of this court reversed. Albert v. Carovano, 824 F.2d 1333, modified on rehearing, 839 F.2d 871 (2d Cir.1987). We ordered reconsideration in banc upon appellees' suggestion, and we now vacate the panel opinion. We affirm the dismissal of the Section 1983 claim, but remand the Section 1981 claim to allow appellants an opportunity to replead it.
 
 BACKGROUND
 
 4
 Chartered in 1812, Hamilton College is a privately-endowed institution of higher learning located in Clinton, New York. Until 1969, it prescribed a concise code of conduct for its students. The College stated only that "Conduct becoming a gentleman is expected of Hamilton men at all times," and that "It is assumed that undergraduates will understand what constitutes gentlemanly conduct without expressed rules to cover every occasion." The College's Judiciary Board limited suspensions to "extremely serious misconduct."
 
 
 5
 The College altered its code of conduct in 1969, however, after New York enacted the Henderson Act. That Act was a response to campus unrest in the 1960's, and as noted, requires colleges both to adopt rules concerning the maintenance of public order on campus and to file those rules with the state.[1] Colleges that fail to comply are not eligible to receive state aid.
 
 
 6
 The language of the Henderson Act requires only that rules adopted and filed pursuant to the Act provide "suspension, expulsion or other appropriate disciplinary action" as penalties for violation of those rules. Beyond this the Act is silent. Colleges are free to define breaches of public order however they wish, and they need not resort to a particular penalty in any particular case. Finally, nothing in the language of Section 6450 requires colleges to enforce the regulations filed pursuant to that Section at all. As we have previously observed, the terms of the Act leave "[o]ne wonder[ing] whether rules and regulations consisting solely of the statement that any individual guilty of a transgression against the public order of the campus shall be required to give the Dean of the College a rose and a peppercorn on Midsummer's Day would satisfy the literal command of the statute in all respects." Coleman v. Wagner College, 429 F.2d 1120, 1124 (2d Cir.1970).
 
 
 7
 To comply with Section 6450, the Trustees of Hamilton College adopted and filed a set of rules styled "Freedom of Expression/Maintenance of Public Order at Hamilton College." Today these rules are incorporated in Hamilton's A Guide to the Policies and Procedures of Hamilton College (1986). Included as examples of "[d]isruptions of public order" are disruptive noise, violence or threats, the destruction of college property, and the disruptive "physical possession of a building." The rules set forth the various tactics and procedures (ranging from "constructive discussion" to court orders) that Hamilton's President may invoke at his or her discretion in response to disturbances. In addition, the rules state:
 
 
 8
 Penalties for violations of the provisions of this Section of "Student Conduct" [referring to a section of the Guide ] (which penalties shall be in addition to any penalty provided for in the New York state penal law or any other New York or federal law to which a violator may be subject) shall include the following:
 
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 b. For students the procedures shall be those set forth under "Student Discipline," [a subsection of "Student Conduct"], and may result in disciplinary action of the most severe kind, including suspension or expulsion;
 
 
 12
 * * *
 
 
 13
 * * *
 
 
 14
 Elsewhere in the Guide, the subsection entitled "Student Discipline" (which was not filed with the state) explains in great detail the processes by which Hamilton's students may be disciplined. Most of this detail is devoted to the structure and conduct of the school's "Judiciary Board," which "has jurisdiction over infractions by students of general standards of conduct." At the same time, however, the Guide suggests that Hamilton's President may dispense with procedures outlined in the Guide. It thus states, "The right of the President to decide finally on any student disciplinary matter is not precluded by the provisions outlined below."
 
 
 15
 According to the complaint and the affidavit of appellant Gur Melamede, the dispute at issue originated in a series of incidents on the Hamilton campus during the academic year 1985-86. Protests developed against apartheid and against Hamilton College's investments in firms doing business in South Africa. According to appellants, some black women students who participated in the protests were the victims of racial insults, and one received several threats on her life. These insults and threats were aggravated in the students' eyes by Hamilton College's alleged failure to investigate the incidents, to establish an African-American Studies program, and to divest itself of investments in firms doing business in South Africa.
 
 
 16
 The College apparently hoped to reduce tensions by scheduling a series of public discussions of prejudice. These efforts backfired. On November 7, 1986, the College held an alumni symposium on the topic of discrimination. Of the four symposium panelists, only one was female, and she was not herself a graduate of Hamilton but rather the wife of an alumnus and the mother of another. Some students considered this panel's composition as sexist. On Monday, November 10, the College held a debate on the issue of divestment, at which a faculty member who favored divestment likened apartheid to Nazism. President Carovano described this comparison as outrageous because it trivialized the Holocaust. Black students in attendance walked out en masse.
 
 
 17
 During the next two days, students formed a coalition among five organizations--the Black and Latin Student Union, the Women's Center, the Gay and Lesbian Alliance, the Progressive Young Democrats, and Hamiltonians for Divestment--in order to protest what they saw as the College administration's failure "meaningfully" to address "the perceived racism, sexism and other prejudice at Hamilton." Complaint p 10. Meanwhile, on Tuesday, November 11, a handwritten leaflet was circulated on campus "[t]o those who are truly black." The leaflet said that "at the Divestment debate our race was truly insulted by ... President Carovano," and announced plans for an "all night 'for real' sit in." This protest apparently never occurred. On the next day, however, a group of approximately forty to sixty students from the student coalition marched on Buttrick Hall, Hamilton's main administrative building. When the students arrived there shortly after 4:00 p.m., they gathered in the lobby, held a moment of silence, and then sang "We Shall Overcome." A few speeches were given. Dean Jervis was told that the students wished to meet with President Carovano. She responded that Carovano was away and warned the students that they would have to leave Buttrick Hall by 4:30 p.m., the building's regular closing time. The students, however, refused to obey. The 4:30 deadline passed, and the students were warned again shortly before midnight. Throughout the night, students freely came and went from the building, a minimum of perhaps ten to fifteen remaining there at any given time. The students, equipped with blankets and sleeping bags, chatted with security guards. An assistant dean brought in some pizza.
 
 
 18
 On the next morning, Thursday, November 13, 1986, the occupation of Buttrick Hall continued. The administrative staff that normally worked in Buttrick was told to stay home. Dean Jervis went to Buttrick at 8:45 a.m. and told the students that the building was off-limits and was closed to outsiders. Jervis warned that if the students did not leave within fifteen minutes, the College would seek a temporary restraining order against their continued presence at Buttrick. In making this announcement, Jervis expressly noted that she was following one of the possible alternatives listed in Hamilton's "Freedom of Expression/Maintenance of Public Order" statement (filed with the state pursuant to the Henderson Act). The students nevertheless persisted.
 
 
 19
 Hamilton thereupon went to the Supreme Court of New York, Oneida County, and later in the morning obtained an order temporarily enjoining the students from "congregating within the College's administrative building ... in such manner as to disrupt or interfere with normal functions conducted by [the College] in such place or to block, hinder, impede or interfere with ingress to or egress from" Buttrick Hall. The College served the order upon the students occupying Buttrick and nailed it to a door of the building. The students, who felt they were not "disrupting" or "interfering" with anyone or anything, refused to budge. At 4:00 p.m., Jervis returned to remind the students yet again that they were, in the view of the College, violating the restraining order. She added that the College was sending letters of warning to those students present who could be identified, and that copies of the warning letters would be sent to the students' parents. The occupation of Buttrick continued.
 
 
 20
 At 11:00 a.m. on Friday, Dean Jervis returned once again. She read a terse notice stating that each of the students in Buttrick was violating the restraining order, that Hamilton would initiate contempt proceedings, and that the students were trespassing and could be subject to criminal charges. Finally, she warned that if they did not vacate Buttrick immediately, the students would be suspended from the College. Jervis personally handed copies of the notice to each of the students. She posted a copy as well. Two hours later, she again returned to Buttrick, where she found the twelve appellants and informed them that they were suspended. Appellants concede that "the defendants advised the students assembled [in Buttrick] that any who did not leave would be suspended." Complaint p 15.
 
 
 21
 On the following Monday, November 17, President Carovano modified the suspensions so that they would not take effect until December 20, 1986, the final day of the fall semester, thus allowing appellants to complete the semester. The Hamilton Trustees were to meet in early December, and the students in question were invited to inform the trustees in writing of their "views on what has happened." The students' written response to this invitation demanded hearings before the Judiciary Board and stated that the chance to air their views before the Trustees did not accord them due process. Carovano also invited the students to present to him any "extraordinary circumstances" that might justify lessening the penalty imposed in any particular case. The students ignored this invitation.
 
 
 22
 Instead, on November 26 the students filed this suit in the Northern District of New York. They asserted three causes of action. The first alleged that the College had violated the due process clause of the fourteenth amendment, and hence Section 1983, when it suspended the students. The second, a pendent state-law claim, alleged that the College had violated its own disciplinary procedures. See Tedeschi v. Wagner College, 49 N.Y.2d 652, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (1980). The third, which did not mention Section 1981 but which appellants now assert states a Section 1981 claim, alleged that the College had selectively enforced its disciplinary code against appellants because they were, among other things, "black, Latin or gay; supportive of the rights of blacks, Latins and gays and without old family ties to Hamilton." Appellants sought a preliminary injunction, and appellees moved to dismiss.
 
 
 23
 The district court promptly granted appellants' request for the expedited discovery of all files maintained by the New York State Education Department regarding the implementation of the Henderson Act. Appellants requested no further discovery. Argument on the parties' opposing motions was initially held on December 19 before Judge Cholakis. After argument, however, Judge Cholakis on his own motion ordered the parties to present evidence on the issue of state action at a hearing that he scheduled for December 23.
 
 
 24
 At the evidentiary hearing, appellants introduced numerous exhibits, virtually all of which came from the files of the State Education Department and concerned the circumstances surrounding the passage of the Henderson Act. These documents were largely intended to prove the state of mind of college administrators in New York in 1969. In addition, appellants called as witnesses Professors Austin Briggs and James Ring, members of the Hamilton faculty who testified about the circumstances surrounding the College's drafting, adoption and filing of its "Freedom of Expression/Maintenance of Public Order" statement in 1969. Briggs testified on direct examination that Hamilton's administration had felt compelled by the Henderson Act to adopt and to file the "Freedom of Expression" statement. Ring identified minutes from faculty meetings held in 1968 and 1969. Neither witness testified as to any involvement by state officials in the drafting of the "Freedom of Expression" statement, and neither gave any testimony about the decision to suspend appellants.
 
 
 25
 Appellants also called Robert D. Stone, Esq., who was, both at the time of the hearing and in 1969, General Counsel to the State Education Department. On direct examination, he testified about a meeting held in Albany in May 1969 between state officials and representatives of various private colleges and universities located in New York. The purpose of this meeting was to discuss and to explain the freshly-minted Henderson Act. Stone was also asked about his understanding of Section 6450:
 
 
 26
 Q: At the time [1969 ] did you have a belief that the colleges were required by the law to eject for instance those who were occupying buildings at some point, or whether they could simply under the legislation let the occupation go on for months?
 
 
 27
 A: It was my understanding of the statute that the penalties for infractions must include ejection. It was not my impression then or now that the legislature meant to instruct the institutions as to when that penalty should be imposed.
 
 
 28
 On cross-examination, Stone explained that the State Education Department's review of filings under Section 6450 is entirely mechanical. Applying the criteria listed in a memorandum written by Stone on May 8, 1969, a junior staff member simply looks at submissions to see if they meet four requirements: (1) that the filings have been "promulgated by the ... governing body of the institution"; (2) that they "relate to the maintenance of public order on the premises of the institution"; (3) that they "govern the conduct ... of students, faculty, staff and all visitors"; and (4) that they provide for "ejection," "suspension, expulsion or other appropriate disciplinary action." Stone's May 8, 1969 memorandum also stated that "a range of penalties may be specified, with provision for the manner in which the specific penalty within the range will be determined in a specific case." Stone also testified as to the Education Department's implementation of Section 6450:
 
 
 29
 Q: Is it fair to say, Mr. Stone, that in 1969 the Department viewed its task in implementing Section 6450 as constituting a ministerial act of comparing the submissions of the colleges with the four items listed in your memo of May 8th, 1969, and determining whether those criteria were contained in each of the submittals?
 
 
 30
 A: That is a fair characterization of the way we saw our task.
 
 
 31
 Q: And after the acknowledgement letter was sent to a particular college advising them that their proposed regulations had been accepted and filed, did the Department undertake any further steps with that college concerning implementation of 6450?
 
 
 32
 A: The chapter, as I recall it, required that any revisions likewise be filed, and if they were, of course, they were reviewed in the same way as the initial submissions, or against the same criteria.
 
 
 33
 I do not recall that the Department did any follow-up to see that that requirement of the statute was met. I think that we did not.
 
 Moments later, he testified:
 
 34
 Q: In fact, you did not draft the statement of rules and procedures that were filed by any of the private colleges in this state, is that correct?
 
 
 35
 A: We did not.
 
 
 36
 Q: And you had no direct involvement, did you, sir, [in] Hamilton College's decision to suspend [the] plaintiff[s] in this action?
 
 
 37
 A: None whatsoever, direct or indirect.
 
 
 38
 Q: Are you aware of anyone in your department who had direct involvement in Hamilton's decision on this?
 
 
 39
 A: I [am] not.
 
 
 40
 Q: In your memorandum of May 8, 1969, you did not list as one of the criteria to be contained in a college's submission, an insistence that a specific remedy be employed in every specific instance of defined misconduct, did you?
 
 
 41
 A: We did [and] do not.
 
 
 42
 Q: And in fact, the enforcement of a college's own rules and regulations with respect to the maintenance of public order in a particular situation was left to the college's judgment, was it not?
 
 
 43
 A: It was.
 
 
 44
 * * *
 
 
 45
 * * *
 
 
 46
 Q: Is it your belief, Mr. Stone, that Section 6450 ... dictated the suspension or other disciplinary penalties on students in any specific situation?
 
 
 47
 A: In my opinion, it does not.
 
 
 48
 The only evidence offered by appellees (other than the cross-examination of appellants' witnesses) was an affidavit of a prominent state judge who had been a member of Hamilton's Board of Trustees in 1969. Judge Cholakis excluded the affidavit, however.
 
 
 49
 In an oral ruling later in the afternoon, Judge Cholakis denied appellants' motion for a preliminary injunction and dismissed the complaint. He stated that appellants' third cause of action "does not plead a 1981 claim. At best, if anything, it pleads a 1983 claim." Thus treating both federal claims as arising under Section 1983, the district court concluded that "it does not appear that there is any likelihood that state action ... could or would be proven." The district court accordingly held that the absence of state action required the dismissal of the federal claims. He then dismissed the pendent state-law claim.
 
 DISCUSSION
 1. The Section 1983 Claim
 
 50
 We first briefly consider procedural points concerning appellants' Section 1983 claim. As already noted, appellees filed a motion to dismiss this claim under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The district court granted that motion, but did so only after conducting a day-long hearing devoted to the question of whether Hamilton was a state actor. Thus, although the district court purported to enter a dismissal on the pleadings, "matters outside the pleadings" were unquestionably "presented to and not excluded by the court," and so we must treat the dismissal as a grant of summary judgment under Rule 56. Fed.R.Civ.P. 12(b); see, e.g., Russo v. Trifari, Krussman & Fishel, Inc., 837 F.2d 40, 42 (2d Cir.1988). Accordingly, the question on the merits of the state action question becomes whether there exists a genuine issue of material fact.[2]
 
 
 51
 Appellants' evidentiary submission in support of their theory of state action is simply beside the point. According to appellants, there is a factual dispute over whether, in 1969, Hamilton College felt compelled by the State of New York to promulgate a set of "rules and regulations" (the "Freedom of Expression/Maintenance of Public Order") that it would not otherwise have adopted. From this uncontested premise, appellants conclude that there is a material issue of fact as to whether Hamilton, in suspending appellants in 1986, acted both in accordance with a rule of conduct prescribed by the state, and under the compulsion of the state. See, e.g., Lugar v. Edmondson Oil Co., 457 U.S. 922, 937-39, 102 S.Ct. 2744, 2753-55, 73 L.Ed.2d 482 (1982).
 
 
 52
 As we explain more fully below, however, appellants' theory of state action suffers from a fatal flaw. That theory assumes that either Section 6450 or the rules Hamilton filed pursuant to that statute constitute "a rule of conduct imposed by the state." Id. at 937, 102 S.Ct. at 2753. Yet nothing in either the legislation or those rules required that these appellants be suspended for occupying Buttrick Hall. Moreover, it is undisputed that the state's role under the Henderson Act has been merely to keep on file rules submitted by colleges and universities. The state has never sought to compel schools to enforce these rules and has never even inquired about such enforcement. In these circumstances, our decisions and those of the Supreme Court preclude a finding of state action.
 
 
 53
 With regard to whether Section 6450 or Hamilton's rules provide a rule of conduct establishing state action, the governing precedents in this circuit are two decisions involving Vietnam-War-era protests at private New York colleges. The first, Powe v. Miles, 407 F.2d 73 (2d Cir.1968), came before passage of the Henderson Act and involved a Section 1983 claim brought by students of Alfred University, some of whom were also students of the New York State College of Ceramics at Alfred University. The students argued, in essence, that Alfred was a state actor because Alfred performed a "public function," namely education; because it was subject to state regulation in many respects; and because it operated the College of Ceramics on behalf of the state. Judge Friendly's opinion for the court in Powe rejected these claims. The plaintiffs' contentions, he said,
 
 
 54
 overlook[ ] the essential point--that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of complaint. When the state bans a subject from the curriculum of a private school, as in Meyer v. Nebraska, 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042] (1923), its responsibility needs no elucidation. State action would be similarly present here with respect to all the students if New York had undertaken to set policy for the control of demonstrations in all private universities or in universities containing contract colleges. But the fact that New York has exercised some regulatory powers over the standard of education offered by Alfred University does not implicate it generally in Alfred's policies toward demonstrations and discipline.
 
 
 55
 Id. at 81 (citations and footnote omitted). As to the plaintiffs who were students at the New York State College of Ceramics, however, Powe held that the actions of Alfred administrators were actions of the state, "for the seemingly simple but entirely sufficient reason that the State has willed it that way." Id. at 82.
 
 
 56
 The second decision, Coleman v. Wagner College, 429 F.2d 1120 (2d Cir.1970), is our only previous encounter with the Henderson Act. The majority opinion stated that "the 'regulation' of college discipline embodied in section 6450 appears almost devoid of meaningful content." Id. at 1124. More importantly, the opinion stated that if Section 6450 were enforced in accordance with its terms, it could not be a basis for finding state action in a private college's disciplinary acts. Id. But we then went on to say: "We are, however, cognizant of the possibility that the statute may have been intended, or may be applied, to mean more than it purports to say." Id. The case was remanded for a hearing on whether "section 6450 represents a meaningful state intrusion into the disciplinary policies of private colleges and universities." Id. at 1125. We directed that the remand focus largely on two issues. The "[m]ost significant" issue was whether state officials regarded their statutory responsibilities as being more than ministerial and believed that they had the power to impose substantive requirements upon, or the right to interfere in the enforcement of, university or college regulations. Id. The second issue involved the "attitude of the college administrators" with respect to the Henderson Act. We noted, however, that we would be "loath" to hold that the state action doctrine is triggered because of a private individual's misunderstanding of the law. Id. Nevertheless, we stated that "[a] reasonable and widespread belief among college administrators ... that section 6450 required them to adopt a particular stance toward campus demonstrators would seem to justify a conclusion that the state intended for them to pursue that course of action." Id. (emphasis added).
 
 
 57
 Judge Friendly concurred separately and took a more expansive view of state action. He favored a "remand for consideration on the merits rather than for the elaborate preliminary inquiry" ordered by the majority. Id. at 1126 (Friendly, J., concurring). Taking note of both the deterrent and the symbolic effects of Section 6450, Judge Friendly stated that "[w]hen a state has gone so far in directing private action that citizens may reasonably believe this to have been taken at the state's instance, state action may legitimately be found even though the state left the private actors almost complete freedom of choice." Id. at 1127 (Friendly, J., concurring).
 
 
 58
 Appellants argue that evidence that in 1969 Hamilton adopted the present code in response to Section 6450 suffices under Coleman to defeat summary judgment. We disagree. Because Coleman held that the language of Section 6450 does not compel college administrators to take particular disciplinary actions, the court directed inquiry on remand into the views of state officials on their role under the Henderson Act and the views of private educational administrators as to their obligations under the Act. The issue in a Coleman-type case today is whether the particular sanction under challenge was imposed as a result of the acts of state officials responsible for enforcement of the Henderson Act or as a result of "a reasonable and widespread belief" by college or university administrators that imposition of the sanction was required by Section 6450. See id. at 1125.
 
 
 59
 The answer to this inquiry is undisputed. Since the passage of the Henderson Act, no state official has ever regarded his or her responsibilities under the Act as more than ministerial, has ever sought to affect disciplinary measures taken by private college administrators, or has ever even inquired into such a matter. The only arguable departure by state officials from a literal reading of the Act is Stone's interpretation that a code must explicitly include expulsion and suspension as possible but not mandatory sanctions. Nor is there any evidence whatsoever that any private college administrators anywhere in the State of New York believe, reasonably or not, that the Henderson Act requires that particular sanctions be imposed for disruption, much less that such a belief was held by Dean Jervis or President Carovano. Indeed, in light of the clarification provided in the intervening years since Coleman, even Judge Friendly's looser test of whether "citizens may reasonably believe [the disciplinary action in 1986] to have been taken at the state's instance," id. at 1127 (Friendly, J., concurring), would not be satisfied. Appellants' submission regarding Hamilton's adoption of a new code of conduct in 1969 is, therefore, of no relevance and does not fulfill the test preferred by either the majority or minority in Coleman.
 
 
 60
 Moreover, appellants' claims are barred by decisions of the Supreme Court. In Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), for example, a class of Medicaid patients challenged decisions of private nursing homes to transfer and discharge patients without affording them either notice or hearing. The patients claimed that the transfers and discharges were attributable to the State of New York because state regulations required the homes "to make all efforts possible to transfer patients to the appropriate level of care or home as indicated by the patient's medical condition or needs." Id. at 1007-08, 102 S.Ct. at 2787-88 (quoting N.Y.Comp.Codes R. & Reg. tit. 10, Secs. 416.9(d)(1), 421.13(d)(1) (1980)). In particular, as the Court explained, the regulations "encouraged for efficiency reasons" the "downward" transfer of patients to "lower levels of care." Id. at 1008 n. 19, 102 S.Ct. at 2788 (emphasis added). To achieve this goal, New York required the nursing homes to complete detailed "patient care assessment forms designed by the State" when making decisions to transfer or discharge patients. Id. at 1008, 102 S.Ct. at 2788. These forms required the homes to provide certain medically relevant information about patients. On the basis of this information and state regulations, the homes would tabulate numerical "scores" indicating proper levels of care. See id. at 1020-27, 102 S.Ct. at 2794-98 (Brennan, J., dissenting). The nursing homes were further required to file the completed assessment forms with state officials, who were in turn required by federal regulations to use the assessments to approve or disapprove Medicaid funding. Id. at 1010, 102 S.Ct. at 2789.
 
 
 61
 Thus, the gantlet of state regulation in Yaretsky was expressly described by the Court as encouraging nursing homes to reduce costs--or, to borrow language from Coleman, "to adopt a particular stance" toward cost containment, 429 F.2d at 1125--and to that end imposed detailed recordkeeping and reporting requirements. Nevertheless, the Court held that the transfer decisions of the nursing homes did not constitute state action, because those decisions "ultimately turn[ed] on medical judgments made by private parties according to professional standards that are not established by the State." Yaretsky, 457 U.S. at 1008, 102 S.Ct. at 2788 (footnote omitted). In particular, the Court relied on the fact that the "regulations do not require the nursing homes to rely on the forms in making discharge or transfer decisions," id., and otherwise "do not dictate [those] decisions." Id. at 1010, 102 S.Ct. at 2789. The court also noted that "[a]djustments in benefit levels in response to [those decisions do] not constitute approval or enforcement" by the state. Id.
 
 
 62
 State involvement in the present case is far less than in Yaretsky. Whereas the assessment forms in Yaretsky contained extremely detailed criteria relating to levels of care, Section 6450 does not set forth criteria for disciplinary decisionmaking. Whereas the nursing homes had to file assessment forms for each patient, Hamilton is not required to report its disciplinary decisions to the state. Finally, even if the state had specifically required (contrary to the undisputed evidence) Hamilton to adopt the precise rules set forth in its Section 6450 statement, the ultimate power to select a particular sanction in individual cases would, as in Yaretsky, rest with the private party. Accordingly, Hamilton's decision to suspend the appellants "ultimately turn[ed] on ... [a] judgment made by [a] private part[y] according to professional standards that were not established by the state." Id. at 1008, 102 S.Ct. at 2788. It thus cannot be state action.
 
 2. The Section 1981 Claim
 
 63
 We come, then, to appellants' Section 1981 claim. It expressly invokes "the Fourteenth Amendment's equal protection and due process clauses and the College's own rules and regulations," and realleges by cross-reference the state-action allegations. Nevertheless, appellants argued both in the district court and on appeal that this claim states a claim for relief under 42 U.S.C. Sec. 1981.[3]
 
 Section 1981 provides:
 
 64
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 65
 42 U.S.C. Sec. 1981. The statute has long been viewed as prohibiting certain forms of discrimination based on race, see, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 369, 374, 6 S.Ct. 1064, 1070, 1073, 30 L.Ed. 220 (1886), and its reference to rights enjoyed by white citizens establishes the "racial character of the rights being protected," McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 293, 96 S.Ct. 2574, 2585, 49 L.Ed.2d 493 (1976) (quoting Georgia v. Rachel, 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966)). In addition, the statute applies to acts of private racial discrimination. Runyon v. McCrary, 427 U.S. 160, 168-75, 96 S.Ct. 2586, 2593-97, 49 L.Ed.2d 415 (1976). Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory, General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982), and racially motivated. E.g., Zemsky v. City of New York, 821 F.2d 148, 150 (2d Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987). Under certain circumstances, however, non-minority plaintiffs may sue someone who has retaliated against them because they did not engage in purposeful racial discrimination. Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969); DeMatteis v. Eastman Kodak Co., 511 F.2d 306, 312 (2d Cir.), modified on other grounds, 520 F.2d 409 (1975). Finally, in accordance with the understanding of the statute's drafters, "race" for the purposes of Section 1981 comprehends ethnicity. Saint Francis College v. Al-Kazraji, --- U.S. ----, 107 S.Ct. 2022, 2026-28, 95 L.Ed.2d 582 (1987).
 
 
 66
 The central allegation in appellants' Section 1981 claim is the following:
 
 
 67
 The defendants are selectively enforcing the College rules on student conduct against plaintiffs because of their criticisms of racism, sexism and other prejudices at Hamilton, and the Administration's indifference to and toleration of such prejudice and because they are black, Latin or gay; supportive of the rights of blacks, Latins and gays and without old family ties to Hamilton.
 
 
 68
 Complaint p 35. Most of this paragraph is simply irrelevant to a claim under Section 1981. Appellants understandably do not argue that Section 1981 provides protection against discrimination on the basis of sexual orientation or family background exclusive of race. Section 1981 was intended to combat racial or ethnic discrimination, nothing more. See Zemsky, 821 F.2d at 150. Appellants also no longer assert that the appellees may violate Section 1981 simply by being "indifferen[t] to and tolera[nt] of ... prejudice," except to the extent that this phrase describes purposeful racial discrimination.
 
 
 69
 We are left, then, with the claim that Hamilton College "selectively enforc[ed]" its rules against appellants "because they are black [or] Latin" and "supportive of the rights of blacks [or] Latins." As to the allegation that the appellants were disciplined because they were black or Latin, it describes purposeful racial discrimination and therefore falls within the general scope of Section 1981. Nevertheless, the complaint as currently drafted does not state a claim under Section 1981 for several reasons.
 
 
 70
 The naked allegation that appellees "selectively enforc[ed] the College rules ... against plaintiffs ... because they are black [or] Latin" is too conclusory to survive a motion to dismiss. See Martin v. New York State Dep't of Mental Hygiene, 588 F.2d 371 (2d Cir.1978). Moreover, no claim is made in the complaint or elsewhere that all the appellants are black or Latin. Indeed, it fails to identify the race or ethnicity of any of the appellants and expressly states that some were disciplined for a variety of other reasons, including sexual orientation and lack of family ties to Hamilton. In fact, these allegations tend to contradict the race or ethnicity claim because they suggest that the sanction of suspension was imposed on all those who remained in Buttrick Hall without regard to their race or ethnicity. See Quarles v. General Motors Corp., 758 F.2d 839, 849 (2d Cir.1985) (per curiam).
 
 
 71
 The complaint also does not state a Section 1981 claim on the theory that the white appellants were "punished for trying to vindicate the rights of minorities protected by [the statute.]" Sullivan v. Little Hunting Park, 396 U.S. at 237, 90 S.Ct. at 404; see also DeMatteis v. Eastman Kodak, 511 F.2d at 312. In this regard, it alleges only that appellants were disciplined "because they are ... supportive of the rights of blacks [and] Latins." The complaint is thus entirely conclusory as to the nature of the Section 1981 rights that were being vindicated by the white appellants. The Section 1981 rights being vindicated by white plaintiffs must be identified with some particularity in order to limit actions under that statute to its purpose. Otherwise, non-minority plaintiffs could bring actions where Section 1981 rights are not implicated. Under the caselaw, for example, non-minority plaintiffs may bring an action under Section 1981 against one who has retaliated against them because they did not engage in purposeful racial discrimination in a contractual or marital context, see, e.g., Alizadeh v. Safeway Stores, Inc., 802 F.2d 111, 114 (5th Cir.1986) (allowing Section 1981 suit by white female alleging she was discharged because her husband was Iranian), Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 890 (11th Cir.1986) (white male alleging he was not hired because his wife was black), DeMatteis v. Eastman Kodak, 511 F.2d at 312 (white person alleging he was forced into retirement because he had sold his house to black person), or because they objected to the defendant's purposeful racial discrimination. Winston v. Lear-Siegler, Inc., 558 F.2d 1266 (6th Cir.1977) (white plaintiff stated a Sec. 1981 claim where he alleged he was discharged because of his protest against racially discriminatory discharge of a black coworker).
 
 
 72
 There is no authority, however, to support the proposition that a non-minority plaintiff may bring a Section 1981 action for retaliation by another as a consequence of the plaintiff's support of political or other causes favored by minorities. Support for members of minority groups protesting investment or curricular policies, protesting a college official's statement that apartheid in South Africa is not similar to the Holocaust, or protesting generalized perceptions of racist attitudes, simply does not implicate Section 1981 rights. Protection of such activity must be found in the first amendment and pursued in a Section 1983 action after a showing of state action. Cf. Keating v. Carey, 706 F.2d 377, 384 (2d Cir.1983) ("Sec. 1981, however generously construed, does not prohibit discrimination on the basis of political affiliation").
 
 
 73
 Finally, even if these dispositive omissions are cured, inferences of discrimination of the kind prohibited by Section 1981 cannot be drawn from the allegations concerning the College's failure to discipline students in other circumstances. The disciplining of appellants involved the uncontested facts of an occupation of a building and an outright refusal to leave at the request of the College's highest officials with full warning as to the penalties that would ensue. See Complaint p 15 ("the defendants advised the students assembled [in Buttrick] that any who did not leave would be suspended"). The allegations concerning Hamilton's failure to discipline students in other circumstances state that Hamilton:
 
 
 74
 (a) failed to discipline or even admonish white students who last spring insulted, harassed and threatened students engaged in lawful protests agianst [sic] the College's policy of continued investment in South Africa;
 
 
 75
 (b) failed to discipline or investigate students who made derogatory racial and sexual slurs to black female students;
 
 
 76
 (c) only reluctantly and belatedly undertook an investigation of death threats against a black woman student active in protesting against the College's South Africa policy;
 
 
 77
 (d) imposed only the mildest punishment upon a fraternity which hazed a pledge by causing him to become intoxicated and taking him through woods where he fell and suffered severe injury; and
 
 
 78
 (e) upon information and belief, failed to impose any but the mildest discipline upon a white male student for raping a woman on campus.
 
 
 79
 Complaint p 36. To support a claim of selective enforcement, appellants must allege "purposeful and systematic discrimination" by specifying instances in which they were " 'singled ... out for unlawful oppression' in contrast to others similarly situated." Birnbaum v. Trussell, 347 F.2d 86, 90 (2d Cir.1965) (quoting Burt v. City of New York, 156 F.2d 791, 791 (2d Cir.1946) (L. Hand, J.)) (emphasis added). None of the allegations of nonenforcement involves circumstances reasonably comparable to those surrounding appellants' suspensions, in particular the uncontested fact of an outright refusal to obey the orders of a college official. Moreover, allegations (a), (b) and (c) are conclusory as to both the actual conduct and the weight of evidence known to college officials, including knowledge of the perpetrators' identities. Allegations (d) and (e) appear to lack a racial element and are conclusory as to the punishment imposed. Of course, we do not mean that exactly, rather than reasonably, comparable cases must be alleged. However, the nature of the infraction and knowledge of the evidence by college officials must be sufficiently similar to support a finding of facial inconsistency. Otherwise, every conclusory selective-enforcement claim would lead to discovery concerning the entire disciplinary history of a college and then to a confusing, unmanageable and ultimately incoherent retrial of every disciplinary decision, including decisions not to investigate.
 
 
 80
 Nevertheless, we remand the district court's dismissal of the Section 1981 claim. Appellants argue that the district court dismissed the claim because the claim cited the fourteenth amendment instead of Section 1981 and that the court did not measure the factual allegations in that claim against the legal standards applicable under Section 1981. Although Judge Cholakis's remarks could easily be read to the contrary, it is possible that, given the ambiguity in the record, appellants thought that it would be futile to seek leave to amend. Accordingly, we remand the dismissal of appellants' third claim to allow them an opportunity to amend their complaint if they can satisfy the pleading requirements discussed supra. Because this restores pendent jurisdiction over appellants' second claim, we remand that claim as well. The dismissal of the first claim is affirmed, and the panel decision is vacated.
 
 
 81
 Affirmed in part and remanded in part.
 
 
 82
 OAKES, Circuit Judge (dissenting and concurring):
 
 
 83
 I dissent from the dismissal of the section 1983 claim and concur in the remand of the section 1981 claim for the reasons stated in the panel opinion, 824 F.2d 1333, modified on reh'g, 839 F.2d 871 (2d Cir.1987), as I do not agree with the majority's narrow treatment of section 1981 law. Speaking solely for myself since, as a matter of en banc law, District Judge Metzner could not rehear this case, I add my comments to the panel opinion.
 
 
 84
 I agree with Judge Friendly's concurring opinion in Coleman v. Wagner College, 429 F.2d 1120, 1126 (2d Cir.1970), that state action occurred when, in response to well-publicized student occupations during the Vietnam War era, the New York legislature enacted New York Education Law Sec. 6450 (McKinney 1985), compelling private colleges to promulgate rules for maintaining public order. I say "compelling" intentionally; the very first sentence of the statute states:
 
 
 85
 1. The trustees or other governing board of every college chartered by the regents or incorporated by special act of the legislature shall adopt rules and regulations for the maintenance of public order on college campuses and other college property used for educational purposes and provide a program for the enforcement thereof.
 
 
 86
 (Emphasis added.)
 
 
 87
 The statute requires that penalties for violation of the rules include "suspension, expulsion or other appropriate disciplinary action." While the words "other appropriate" may be weasel words, the statutory injunction forbidding "state aid or assistance" to colleges that failed to conform to section 6450(1), N.Y.Educ.Law Sec. 6450(2), provided an irresistible incentive for colleges to establish the strictest penalties possible for student misconduct. Numerous colleges took this threat seriously and registered their opposition to the new statute. See Letter from Frederick M. Binder, Associate Commissioner for Higher Education, New York State Education Department, to Lester W. Ingalls, Executive Vice President, Association of Colleges and Universities of the State of New York (August 21, 1969). As the trustees of one private college wrote, "Threatening to withhold State financial aid for non-compliance with the law is, in our view, tantamount to coercion." Letter from Trustees of Hobart and William Smith Colleges to Governor Nelson A. Rockefeller (June 14, 1969). For the majority to say that there is no "evidence whatsoever that any private college administrators anywhere in the State of New York believe, reasonably or not, that the Henderson Act requires that particular sanctions be imposed for disruption," majority op. at 570, seems to me plain wrong.
 
 
 88
 State officials sent a strong message to colleges that strict adherence to the new law was required and that the harsher penalties should be adopted. Within days of the passage of section 6450, high ranking state education officials (including two Regents, the Deputy Commissioner of Education for Higher and Professional Education, and the Counsel to the Education Department) met with college officials (including the Director of the Association of Colleges and Universities of the State of New York, an organization of which Hamilton and practically all of the other colleges in New York were members). Rejecting the wishes of at least some colleges for "minimum compliance [with section 6450] tied in with some vague and evasive statements," Frederick M. Binder, Memorandum, "Summary of the Meeting Called to Discuss the Amendment to the Education Law 129A--Campus Unrest," at 2 (May 6, 1969), state officials insisted that compliance with the law required that "the rules must be precise." Id. Robert Stone, Counsel to the Education Department, stated that the legislature clearly intended that the institutions should not " 'exercise as much forebearance as they have.' " Quoted in Memorandum from John J. Meng, Executive Vice President of Fordham University, to President and Vice Presidents of Fordham University, at 2 (May 6, 1969). The state officials informed the college representatives that section 6450's requirement of a "program for the enforcement" of the rules meant that each college "must list the steps it will take if the specified rules are breached," id. (emphasis added); that the regulations must provide for the ejection of disrupters; that this provision must be applied after a " 'reasonable time' " has elapsed, id. at 3 (quoting Robert Stone); and that "[n]on-application of the ejection rule would certainly not be acceptable." Id. As one official noted at the meeting, "[t]he legislature clearly intended to take away from institutions the choice of whether or not to eject violators." Id. at 4. In fact, soon thereafter the legislature established a state commission to study and investigate campus unrest. The State Education Department formally advised all colleges that the commission would study the need for additional legislation, raising the spectre of further regulation and intervention if colleges did not comply with section 6450. A clear threat was in the air. Under these circumstances, had Hamilton actually imposed " 'a rose and a peppercorn on Midsummer's Day,' " majority op. at 564 (quoting Coleman v. Wagner College, 429 F.2d 1120, 1124 (2d Cir.1970)), instead of the most severe penalties, there would have been more than a hue and cry; there would have been "very midsummer madness." W. Shakespeare, Twelfth Night, or, What You Will III.iv.56 (G. Evans ed. 1974).
 
 
 89
 Whether state education officials thought they had a duty to regulate campus protest, state law imposed such a duty on them, giving their actions the weight and authority of the state. See N.Y.Educ.Law Sec. 207 (McKinney 1988) (regents "exercise legislative functions concerning the educational system of the state," including its private institutions; "determine its educational policies"; and "establish rules for carrying into effect the laws and policies of the state, relating to education"); id. Sec. 305(1) (commissioner of education enforces education laws and executes policies determined by regents). See also Powe v. Miles, 407 F.2d 73, 81 (2d Cir.1968); Warder v. Board of Regents, 53 N.Y.2d 186, 423 N.E.2d 352, 440 N.Y.S.2d 875, cert. denied, 454 U.S. 1125, 102 S.Ct. 974, 71 L.Ed.2d 112 (1981); cf. O'Neil, Private Universities and Public Law, 19 Buffalo L.Rev. 155, 185 (1970) (uniqueness of New York's far-reaching regulatory authority over private institutions of higher learning). The fact that state education officials have made little use of the rules since their adoption is, to my mind, immaterial, in light of the initial pressure on colleges to adopt regulations that provide suspension and expulsion as penalties and to impose these penalties where there are violations.
 
 
 90
 The history of Hamilton's code of conduct illustrates the pressure felt by colleges to comply with section 6450's mandate. Hamilton was "quite content" with its pre-Henderson Act regulations. Albert v. Carovano, No. 86-CV-1302 (N.D.N.Y. Dec. 29, 1986) (deposition of Hadley S. DePuy, Associate Dean of Hamilton College, 1965 to 1972). According to Associate Dean DePuy, those "minimal regulations enabled our campus to maintain an open dialogue with the students." Id. Hamilton preferred to address "student unrest on a case-by-case basis, ... [without] specif[ying] the particular steps to be taken during a demonstration, nor the specific situations which would have been considered improper during a demonstration." Id.
 
 
 91
 Once the legislature enacted section 6450, however, Hamilton was forced to change its regulations. A faculty committee was convened to prepare the college's proposed rules pursuant to a procedure set out in the college's charter. The committee did not readopt the then existing regulations because it was necessary "to be far more specific than we had been in the past" in order to "satisfy the State." Id. (testimony of Austin E. Briggs, Jr., Professor, Hamilton College). Asked whether the committee thought it had the choice of pursuing its "own independent judgment" in drafting the new regulations, one faculty member testified, "No, no, we felt we had none.... [W]e were in fact told by the president of the college that we had no choice in this matter." Id. Thus, according to this faculty member and the then Dean of Students, the committee's proposal did not reflect the committee's independent professional judgment as to what was best for Hamilton as an educational institution, but rather the dictates of the Henderson Act.
 
 
 92
 The faculty as a whole approved the proposed regulations and recommended that the board of trustees submit the regulations to the State, a recommendation which the board accepted. One participant recalled the faculty meeting as follows:
 
 
 93
 Hugh Jones, who was with the college trustees at that time, and was a prominent lawyer, explained to us at that meeting, and we knew it before the meeting ... explained to us quite clearly that we were obliged to adopt these regulations.... We had to have a more strict set, more specific set of regulations and we, the faculty, if we were not to adopt it, there would be penalties imposed upon the college. We had no choice. We really had to accept these regulations.
 
 
 94
 Id. (testimony of James Ring, Professor, Hamilton College). Hugh Jones was, of course, subsequently a distinguished member of the New York Court of Appeals.
 
 
 95
 Hamilton's post-Henderson Act regulations define proper order on campus and provide the specific steps the president "shall" take when "normal procedures have failed to maintain" proper order. Ending the college's flexibility to pursue an unlimited "open dialogue," id. (DePuy deposition at 4), the new regulations prohibit discussions from continuing "without limit" when there is "interference with the conduct of any college activity or access to any college-controlled facility." A Guide to the Policies and Procedures of Hamilton College, at 43 (September 1986). If there is such interference or if there is no substantial progress in the talks after a "reasonable" time, the rules require the college to close the campus to outsiders and the disrupted area to students, and to warn the disrupters that the college will seek an order from a court of competent jurisdiction requiring them to cease their activities or face ejection from the campus. If the disruption nonetheless persists, the president "shall apply forthwith" to the court for the order and serve it upon the disruptive students. Id. at 44. The regulations provide that suspension or expulsion previously imposed only for "extremely serious misconduct," are now possible sanctions for any violation of the rules on campus order. Thus Hamilton, although previously content with its existing regulations, promulgated a "more strict set, more specific set of regulations," Albert, No. 86-CV-1302 (testimony of James Ring, Professor, Hamilton College), to comply with the mandate of section 6450 and the pressures exerted by state officials on the New York colleges. It is those changes which are directly implicated in the disciplinary actions against the student-appellants here. To say that "Hamilton's adoption of a new code of conduct in 1969 is ... of no relevance," majority op. at 570, is, I think, to sweep the chess pieces off the board.
 
 
 96
 In the instant case, Hamilton officials closely followed the 1969 code. Dean of Students Jervis closed the campus to outsiders, barred students from Buttrick Hall, and warned the students that, unless the disruption ceased, the college would seek a court injunction. President Caravano cited the students' failure to obey the off-limits declaration and their alleged defiance of the temporary restraining order as the reasons for imposing discipline. In light of the college's precise compliance with rules demanded by the legislature and state education department officials, the present college dean and president's suggestion of independent action is inapposite if not disingenuous.
 
 
 97
 In the confusing sea of state action law, see L. Tribe, American Constitutional Law ch. 18 (2d ed.) (forthcoming), where the Supreme Court has declared the formulation of "an infallible test" an " 'impossible task,' " Reitman v. Mulkey, 387 U.S. 369, 378, 87 S.Ct. 1627, 1632, 18 L.Ed.2d 830 (1967) (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961)), the majority relies primarily upon Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), and concludes that Hamilton's actions were not caused by a rule of conduct imposed by the State. In Yaretsky, the Court noted the absence of a challenge to a particular state regulation, 457 U.S. at 1003, 102 S.Ct. at 2785, but said that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." 457 U.S. at 1004, 102 S.Ct. at 2786. In a companion case, Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Court found no state action where a private school's decisions to discharge certain employees "were not compelled or even influenced by any state regulation." 457 U.S. at 841, 102 S.Ct. at 2771. Here, the State did exercise coercive power and did so overtly. Had the pre-Henderson Act regulations been in effect at the time of appellants' protest, that protest might or might not have amounted to the "extremely serious misconduct" necessary to authorize suspension. In contrast, the regulations adopted in direct response to the Henderson Act and concomitant state pressure permit the severe penalty of suspension for any misconduct. At the very least, I believe the students have shown that a factual dispute exists as to whether Hamilton's actions were caused by a rule of conduct imposed by the State, see Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 155-56, 98 S.Ct. 1729, 1732-33, 56 L.Ed.2d 185 (1978), and, in my view, have satisfied the first part of the state action test.
 
 
 98
 The second part--whether Hamilton College, its President, and its Dean were state actors--is less clear. The discovery time available to the plaintiffs was extremely short. Less than four weeks elapsed between commencement and dismissal of the action and appellants had access to state Education Department files for only one week before the evidentiary hearing. Still, enough appears in the record to warrant further inquiry into whether, as I believe, the Hamilton officials took steps compelled by regulations which in turn were compelled by the statute as interpreted by state education officials and college administrators. The conduct of the college and the college officials was thus "chargeable to the State," Lugar, 457 U.S. at 937, 102 S.Ct. at 2754, given the "sufficiently close nexus between the State and the challenged action of the regulated entity." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974); see also Burton, 365 U.S. 715, 81 S.Ct. 856.
 
 
 99
 Even though the unanimity among those of my colleagues who sat on this case when reheard has caused me to think long and hard as to whether Judge Metzner and I had not in the panel opinion gone astray, the "sifting [of] facts and weighing [of] circumstances" required by Burton, 365 U.S. at 722, 81 S.Ct. at 860, quoted in Lugar, 457 U.S. at 939, 102 S.Ct. at 2755, convince me that "the nonobvious involvement of the State," id., is of sufficient significance to warrant trial on the section 1983 claim.
 
 
 100
 Concerning the section 1981 claim, as to the disposition of which I concur, I add just a few words to note my disagreement with the majority's reasoning. The crabbed reading of section 1981 in Judge Winter's opinion fails to recognize that non-minority plaintiffs only need show unfair discrimination in response to their efforts to aid minorities in the exercise of their rights, in order to state a section 1981 claim. DeMatteis v. Eastman Kodak Co., 511 F.2d 306, 312 (2d Cir.), modified on other grounds, 520 F.2d 409 (1975) (holding that "a white person who has been '... punished for trying to vindicate the rights of [non-white] minorities ...' has standing to sue under Sec. 1981" (quoting Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969))).
 
 
 
 [1]
 Section 6450 provides, in pertinent part:
 
 
 [1]
 The trustees or other governing board of every college chartered by the regents or incorporated by special act of the legislature shall adopt rules and regulations for the maintenance of public order on college campuses and other college property used for educational purposes and provide a program for the enforcement thereof.... Such rules and regulations shall govern the conduct of students, faculty and other staff as well as visitors and other licensees and invitees on such campuses and property. The penalties for violations of such rules and regulations shall be clearly set forth therein and shall include provisions for the ejection of a violator from such campus and property, in the case of a student or faculty violator his suspension, expulsion or other appropriate disciplinary action.... Such penalties shall be in addition to any penalty pursuant to the penal law or any other chapter to which a violator or organization may be subject. Such rules and regulations shall be filed with the regents and the commissioner of education not later than ninety days after the effective date of this act.... All amendments to such rules and regulations shall be filed with the regents and the commissioner of education not later than ten days after their adoption
 
 
 [2]
 If the trustees or other governing board of a college fails to file the rules and regulations within the time required by this section such college shall not be eligible to receive any state aid or assistance until such rules and regulations are duly filed
 
 
 [3]
 Nothing contained in this section is intended nor shall it be construed to limit or restrict the freedom of speech nor [sic] peaceful assembly
 
 
 [2]
 Appellants challenge the procedures underlying their suspension on two grounds. The first is a state claim asserting that Hamilton failed to follow its own disciplinary procedures. The second is a federal due process claim asserting that the reasons given by Hamilton have varied--violation of the restraining order, remaining in Buttrick Hall after it had been declared "off-limits," failure to leave after being so ordered by Dean Jervis on Friday, or the "overnight occupations" of Buttrick--and appellants have thus not had adequate notice of the charges against them. Whether these allegations suffice to distinguish Farrell v. Joel, 437 F.2d 160 (2d Cir.1971), given the complaint's admission in paragraph 15 that "the defendants advised the students [in Buttrick] that any who did not leave would be suspended" is not before us, in view of our disposition of the state-action issue
 
 
 [3]
 Appellees claim that the complaint's citation of the fourteenth amendment instead of Section 1981 should prove fatal to the claim. In particular, they claim that "[o]nly at the eleventh hour, facing defeat on the state action issue underlying their preliminary injunction request, did plaintiffs suddenly urge Sec. 1981." Appellees' contentions are unpersuasive. The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters. See, e.g., Newman v. Silver, 713 F.2d 14, 15 n. 1 (2d Cir.1983)