James F. COLLINS, Jr.; Tammy Lee Collins; Kimberlee Huckaby; Joan S. Patton; Cheryl Sullenger, Plaintiffs–Appellees,

v.

WOMANCARE, a Feminist Woman's Health Center, a California nonprofit corporation; Deborah Fleming; Patricia O'Neil, Defendants–Appellants.

No. 88–5703.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 13, 1989.

Decided June 23, 1989.

Mark E. Merin, Kanter, Merin, Dickstein & Kirk, Sacramento, Cal., for defendants-appellants.

Lloyd E. Tooks, San Diego, Cal., for plaintiffs-appellees.

Before WALLACE, CANBY and TROTT, Circuit Judges.

WALLACE, Circuit Judge:

The contentious public debate over the propriety of abortions forms the background of the appeal before us. As an outgrowth of a picketing episode, the district court entered a judgment awarding damages in favor of five plaintiffs in their action for false arrest and for deprivation of constitutional rights under 42 U.S.C. § 1983 against Womancare, two of its employees, and its directors (Womancare). The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3). We have jurisdiction of Womancare's timely appeal pursuant to 28 U.S.C. § 1291. We reverse and remand.

I

Womancare is a nonprofit corporation organized under California law and located in San Diego, California. Womancare offers women various health services, including abortions. Deborah Fleming and Patricia O'Neil are Womancare's executive and associate directors, respectively. In recent years, Womancare's offices have been the scene of repeated protests and picketing by demonstrators opposed to abortion. To combat the disruption caused by these protests, Womancare brought suit in the California Superior Court in San Diego against various demonstrators: the Bible Missionary Fellowship; its pastor, Dorman Owens; the Independent Baptist Church; and two hundred Does. Womancare sought and obtained a preliminary injunction. The preliminary injunction, effective "pending the trial" in state court, was issued on October 5, 1984. It prohibited both parties' "agents, servants, officer[s], employees, representatives, and all persons acting in concert or participating with them" from "engaging in or performing, directly or indirectly" various enumerated acts, including "yelling, screaming, assaulting, disparaging or defaming each other or the clients of [Womancare]," and "conduct[ing] their picketing and/or preaching any closer than across the street from [Womancare's] property."

On October 1, 1985, Womancare was in the process of moving into new offices. A group of protesters demonstrated across the street. It is undisputed that some of these protesters were subject to the state court's preliminary injunction. Meanwhile, the five plaintiffs here—James Collins, Jr., Tammy Collins, Kimberlee Huckaby, Joan Patton, and Cheryl Sullenger (collectively Collins group)—began to picket on Womancare's side of the street. Womancare employees Fleming and O'Neil approached the picketers, attempted to serve them with the injunction, told them that their picketing on Womancare's side of the street violated the injunction, and asked them to move across the street. The Collins group refused. Fleming telephoned the San Diego police department. A police officer arrived and, after talking with the demonstrators, decided to take no action. He advised Fleming that she had the power to effect citizen's arrests, but cautioned her that this action could subject her to civil liability for false arrest. Fleming then telephoned Womancare's attorney, who advised her to perform citizen's arrests on people who were violating the injunction. Fleming and O'Neil placed the Collins group under citizen's arrest. The police detained the Collins group long enough to issue misdemeanor citations for violating the injunction. The Collins group then left. They were later prosecuted on the misdemeanor citations in San Diego Municipal Court, but the citations were dismissed prior to trial.

The Collins group then brought this action against Womancare alleging both a deprivation of constitutional rights under 42 U.S.C. § 1983 and malicious prosecution. They moved for an interlocutory summary judgment on count one, the section 1983 claim. In granting summary judgment for the Collins group, the district court held that while they had produced evidence tending to show that the arrested demonstrators were not acting in concert with enjoined parties, Womancare had produced no evidence tending to negate this evidence. Thus, there was no genuine issue of fact whether the protesters were subject to, and therefore violating, the injunction. The court also held that Womancare and its officers acted under color of state law and

abridged the Collins group's first amendment rights of free speech and assembly.

The parties proceeded to trial on the remaining claim. After the close of evidence, the district judge apparently granted an oral motion to conform the pleadings to the evidence, allowing the Collins group to state a claim for false arrest. The district judge then granted the Collins group's motion for a directed verdict on the false arrest claim. The court apparently relied in part on its prior summary judgment on the section 1983 claim, which in turn had depended upon a determination that the Collins group was not violating the injunction. Liability having been determined, the issue of damages then went to the jury. The jury awarded each plaintiff $1,800 in compensatory and $10,000 in punitive damages. Womancare unsuccessfully moved for a new trial, judgment notwithstanding the verdict, and relief from judgment.

Womancare raises numerous arguments in this appeal. It challenges the district court's entry of interlocutory summary judgment on the Collins group's section 1983 claim on the following grounds: (1) the picketing was not protected by the first amendment; (2) Womancare did not act under color of state law because it neither acted pursuant to a citizen's arrest statute nor exercised a traditional sovereign function; (3) there remained genuine issues of material fact regarding whether (a) Womancare acted jointly with the police, (b) probable cause to arrest existed, and (c) the arrested demonstrators were bound by the injunction; and (4) summary judgment was granted prematurely because Womancare had not had the opportunity to conduct significant discovery. Womancare challenges the district court's directed verdict in favor of the Collins group on the false imprisonment claim, arguing that there was substantial conflicting evidence regarding whether the arrested demonstrators were acting in concert with those subject to the injunction. Womancare further contends that the district court erred in giving the jury an instruction on punitive damages. Lastly, Womancare challenges the denial of various post-trial motions. Because we reverse the interlocutory sum-

mary judgment on the Collins group's section 1983 claim, upon which the determination of liability on the second count also depended, we need not reach the other issues in this case.

## II

We first address the issues related to the summary judgment on the section 1983 claim. We review a summary judgment independently. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). We apply the same standard used by the trial court under Fed.R.Civ.P. 56(c). *Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir.1985). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c).

To prove a violation of section 1983, the Collins group must demonstrate that Womancare (1) deprived them of a right secured by the Constitution, and (2) acted under color of state law. 42 U.S.C. § 1983; *West v. Atkins*, —— U.S. ——, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (*West*). The Collins group alleged a deprivation of their first amendment rights to free speech and association. The fourteenth amendment, which incorporates the first amendment against the states, applies only against acts of a state, i.e., "state action." *Rendell–Baker v. Kohn*, 457 U.S. 830, 837, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982) (*Rendell–Baker*). The fourteenth amendment "erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948) (footnote omitted). Thus, in order to demonstrate the alleged deprivation, the Collins group had to show "state action" under the fourteenth amendment. The second prong under section 1983 imposes an independent requirement of showing action "under color of" state law. *See Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155–56, 98 S.Ct. 1729,

1732–33, 56 L.Ed.2d 185 (1978) (*Flagg Brothers*).

Section 1983's under-color-of-state-law requirement and the fourteenth amendment's "state action" requirement are closely related. In fact, "until recently, th[e] Court did not distinguish between the two requirements at all." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 928, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 482 (1982) (*Lugar*); *see also United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed. 2d 267 (1966) (*Price*) ("In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment."). Though describing the two requirements as "obviously related," *Lugar*, 457 U.S. at 928, 102 S.Ct. at 2749, the Court in *Lugar* declined to equate the two elements. The Court held that conduct which qualifies as "state action" under the fourteenth amendment also satisfies section 1983's under color of state law requirement. *Lugar*, 457 U.S. at 935 & n. 18, 102 S.Ct. at 2752 & n. 18. The Court left open the possibility, however, that it might take less to demonstrate action under color of state law than to demonstrate state action. *Id.* at 935 n. 18, 102 S.Ct. at 2752 & n. 18; *see also Howerton v. Gabica*, 708 F.2d 380, 382 n. 5 (9th Cir.1983) (*Howerton*). Because the Collins group was required to establish state action, for purposes of our analysis in this case we can treat the state action and action under color of law requirements as equivalent. *See Gorenc v. Salt River Project*, 869 F.2d 503, 506 (9th Cir.1989) (*Gorenc*); *Melara v. Kennedy*, 541 F.2d 802, 804 (9th Cir.1976) (*Melara*).

The Supreme Court has repeatedly cautioned that while the principle of "state action" is "easily stated, the question of whether particular discriminatory conduct is private, on the one hand, or amounts to 'state action,' on the other, frequently admits of no easy answer." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972); *see also Evans v. Newton*, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966) (*Evans*). According to the Court, "[o]nly by

sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961) (*Burton*); *see also Evans*, 382 U.S. at 299–300, 86 S.Ct. at 488–89.

In granting summary judgment on the section 1983 claim, the district court did not separately analyze the "state action" issue. The court simply concluded that the Collins group's "constitutional rights of speech and assembly protected by the First Amendment" had been abridged. It then set forth this analysis in concluding that defendants had acted under color of state law:

> Defendants' action of placing plaintiffs under citizen's arrest on October 1, 1985, was action taken "under color of state law" within the meaning of 42 U.S.C. § 1983. Private citizens can be liable under Section 1983 if the citizen is a "willful participant in joint activity with the State or its agents." *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966). California law delegates the power to make an arrest to private citizens in some situations. The delegation of a traditional state function to a private citizen can give rise to liability of the private citizen under § 1983. The arrest of citizens for violations of the law is traditionally performed by agents of the state. Therefore, a private citizen who effectuates a citizen's arrest is performing a function of the state and acts under color of state law.

(Citations omitted.) The district court's order mentions three different arguments which might support a finding of state action or action under color of state law: Womancare employees (1) acted pursuant to California's citizen arrest statute: (2) exercised a "traditional state function" by effecting a citizen's arrest; or (3) were engaged in a joint venture or joint action with the state and its agents, namely San Diego police officers. *See Gorenc*, 869 F.2d at 506–09 (applying four different

tests for state action); *Howerton,* 708 F.2d at 382–83 (cataloging tests used to determine presence of "state action" or action "under color of state law"); *Melara,* 541 F.2d at 805–08 (same).

It is important to distinguish between two kinds of theories advanced by the Collins group. The first kind of theory focuses on *the citizen's arrests alone,* and is exemplified by their first and second arguments for state action. They argue that in making the arrests, Womancare employees—admittedly private parties—were engaging in state action because they either (1) acted pursuant to state statutory authorization, or (2) exercised a traditional sovereign function. Indeed, these two arguments frequently have been employed to show that acts of *private persons* can fairly be attributed to the state because the state either has authorized their acts or has delegated an exclusive sovereign function to them. By contrast, the Collins group's "joint action" theory is of a second kind. It focuses not just on the actions of Womancare employees in making the citizen's arrests, but considers also the role of state officials—here, San Diego police officers and a state prosecutor—in the larger episode of the citizen's arrests. Under this second type of theory, there is no question that state actors were involved in the challenged conduct; the only question is whether Womancare, the private party, acted as "a willful participant in joint activity" with the state's agents. *Price,* 383 U.S. at 794, 86 S.Ct. at 1157. We will treat these two distinct types of theories in sections B and C, respectively. But first, we will review the federal case law involving suits under section 1983 involving citizens' arrests.

### A.

The Supreme Court has never decided whether a citizen's arrest would qualify as state action or action under color of state law for section 1983 purposes. In *Williams v. United States,* 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951), the Court held that a lumber company employee's use of violent means to obtain a coerced confession from suspected thieves violated 18 U.S.C. § 242, the criminal analogue of 42 U.S.C. § 1983. The under-color-of-state-law requirements of sections 242 and 1983 are coextensive. *Dennis v. Sparks,* 449 U.S. 24, 28 n. 5, 101 S.Ct. 183, 187 n. 5, 66 L.Ed.2d 185 (1980) (*Sparks*); *Price,* 383 U.S. at 794 n. 7, 86 S.Ct. at 1157 n. 7. *Williams,* however, turned on two crucial facts: (1) the employee was a "special" police officer, and (2) a regular police officer had also been present during the interrogation. 341 U.S. at 98–99, 71 S.Ct. at 577–78. In holding that Williams's actions were undertaken under color of law, the Court stressed that he "held a special police officer's card issued by the City of Miami, Florida, and had taken an oath and qualified as a special police officer." *Id.* at 98, 71 S.Ct. at 578. The Court also stressed that Williams had been "vested with policemen's powers" pursuant to the City of Miami's policy, and that his investigation was "conducted under the aegis of the State, as evidenced by the fact that a regular police officer was detailed to attend it." *Id.* at 99–100, 71 S.Ct. at 578. *Williams* therefore sheds little light on this case or the status of a citizen's arrest.

Some thirteen years later in *Griffin v. Maryland,* 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), the Court held that state action existed where a private amusement park's employee arrested, transported to the police station, and swore out a complaint against black picketers for trespassing in the all-white park. As in *Williams,* though, the Court's holding turned on the fact that the employee "had been deputized as a [county] sheriff," 378 U.S. at 132, 84 S.Ct. at 1771, and "purported to exercise the authority of a deputy sheriff. He wore a sheriff's badge and consistently identified himself as a deputy sheriff rather than as an employee of the park." *Id.* at 135, 84 S.Ct. at 1772; *see also Flagg Brothers,* 436 U.S. at 163–64 n. 14, 98 S.Ct. at 1737 n. 14.

*Flagg Brothers* involved a challenge to a warehouseman's proposed sale, under a New York statute, of goods entrusted to him for storage. The Court, in holding that this action did not constitute state action, analyzed whether the state statute

"delegated to Flagg Brothers a power 'traditionally exclusively reserved to the State.'" 436 U.S. at 157, 98 S.Ct. at 1734, *quoting Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974) (*Jackson*). The Court concluded that it did not, reasoning that "the settlement of disputes between debtors and creditors is not traditionally an exclusive public function." *Id.*, at 161, 98 S.Ct. at 1736. The Court went on to observe that other state and municipal functions "have been administered with a greater degree of exclusivity by States and municipalities than has the function of so-called 'dispute resolution'"; the Court cited "police protection" as an example. *Id.* at 163, 98 S.Ct. at 1737. The Court was quick to point out, however, that this observation was dictum. *See id.* at 163–64, 98 S.Ct. at 1737–38. In his dissent, Justice Stevens, citing *Griffin*, stated that "it is clear that the maintenance of a police force is a unique sovereign function, and the delegation of police power to a private party will entail state action." *Id.* at 172 n. 8, 98 S.Ct. at 1742 n. 8 (Stevens, J., dissenting). The majority, however, flatly disagreed with this statement and with Justice Stevens's reading of *Griffin:*

> Contrary to MR. JUSTICE STEVENS' suggestion, *post,* at 172 n. 8 [98 S.Ct. at 1742 n. 8] this Court has never considered the private exercise of traditional police functions. In *Griffin v. Maryland,* 378 U.S. 130 [84 S.Ct. 1770, 12 L.Ed.2d 754] (1964), the State contended that the deputy sheriff in question had acted only as a private security employee, but this Court specifically found that he "purported to exercise the authority of a deputy sheriff." *Id.*, at 135 [84 S.Ct. at 1772]. *Griffin* thus sheds no light on the constitutional status of *private police forces,* and we express no opinion here.

*Id.* at 163–64 n. 14, 98 S.Ct. at 1737 n. 14 (emphasis added). As the highlighted language indicates, the majority had in mind the scenario not of an isolated citizen's arrest, but rather of a municipality or state's delegation of its entire police power to a private police force. *Flagg Brothers*

therefore provides no guidance on whether a citizen's arrest constitutes state action or action under color of state law. Indeed, *Flagg Brothers* demonstrates that the Court "has never considered the private exercise of traditional police functions." *Id.* at 163 n. 14, 98 S.Ct. at 1737 n. 14.

Our research has uncovered only five federal decisions involving section 1983 actions based on citizen's arrests. *See Carey v. Continental Airlines, Inc.,* 823 F.2d 1402 (10th Cir.1987) (*Carey*); *Lee v. Town of Estes Park,* 820 F.2d 1112 (10th Cir. 1987) (*Lee*); *Warren v. Cummings,* 303 F.Supp. 803 (D.Colo.1969); *Shakespeare v. Wilson,* 40 F.R.D. 500 (S.D.Cal.1966); *Bryant v. Donnell,* 239 F.Supp. 681 (W.D. Tenn.1965). All of these cases held that a citizen's arrest did not constitute state action or action under color of state law. Thus, every federal case which has considered whether a citizen's arrest can form the basis of liability under section 1983 has resolved this issue contrary to the district court's summary judgment in this case. However, the Supreme Court has cautioned that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton,* 365 U.S. at 722, 81 S.Ct. at 860. We have recognized the fact-dependent nature of the state-action inquiry, *see Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1338 & n. 17 (9th Cir.1987), and therefore in each case have examined all of the circumstances surrounding the challenged action "in their totality." *Howerton,* 708 F.2d at 384. Therefore, we must analyze the Collins group's various theories of state action in light of the specific facts and circumstances of this case.

**B.**

■ We turn first to the Collins group's arguments based on the citizen's arrests alone. The proper framework for analysis of their first two arguments of state action —that Womancare employees (1) acted pursuant to California's citizen arrest statute and (2) exercised a "traditional state function" by effecting the citizen's arrests—

was set forth in *Lugar*. There, the Court explained that for conduct by *private parties* to be under color of state law, it must be "fairly attributable to the State." *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753. The Court set forth a two-part test for making this determination:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Id.; see also West*, 108 S.Ct. at 2255 (invoking *Lugar* test). The Eight Circuit has aptly labeled these two elements of the *Lugar* test the "state policy" and "state actor" requirements, respectively. *Roudybush v. Zabel*, 813 F.2d 173, 176 (8th Cir. 1987) (*Roudybush*). The state policy requirement ensures that the alleged deprivation is fairly attributable to a state policy. *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2754; *Roudybush*, 813 F.2d at 177. The state actor requirement ensures that not all private parties "face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2754. Both elements under *Lugar* must be met for there to be state action. *See id.* at 937–39, 102 S.Ct. at 2753–55.

■ The Collins group's first two arguments correspond to the two prongs of the test set forth in *Lugar*. *See id.* at 937, 102 S.Ct. at 2753. Because our analysis of the citizen's arrest reveals that Womancare's employees' actions failed to meet the first prong of the *Lugar* test, we need not consider the Collins group's second, sovereign function argument.

Under the first *Lugar* prong, the deprivation of rights must be "caused by the exercise of some right or privilege created

by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Id.* at 937, 102 S.Ct. at 2753. The Collins group argues that Womancare's employees acted pursuant to California's citizen's arrest statutes, and therefore the first prong under *Lugar* is met.

Section 834 of the California Penal Code defines "arrest," and identifies those authorized to make arrests as "a peace officer or ... a private person." Cal.Penal Code § 834 (West 1985). Section 837 delineates the circumstances under which a private person may arrest another:

1. For a public offense committed or attempted in his presence.

2. When the person arrested has committed a felony, although not in his presence.

3. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it.

Cal.Penal Code § 837 (West 1985). Sections 837(2) and (3) do not apply here, since the demonstrators' alleged offense—violating a court order—is not a felony under California law. According to the police report, the citizen's arrests were made for violations of section 1209 of the California Code of Civil Procedure. Section 1209 defines contempt of court as including "[d]isobedience of any lawful ... order ... of the court." Cal.Code Civ.Proc. 1209(a)(5) (West Supp.1989); *see also id.* at §§ 178, 1218 (providing, respectively, for judicial authority to punish contempts and for penalties of fines and incarceration). And section 166 of the California Penal Code makes "[w]illful disobedience of any ... order lawfully issued by any Court" a misdemeanor. Cal.Penal Code § 166(4) (West 1988).

Womancare employees therefore purported to act under section 837(1), which authorizes citizen arrests for "a public offense committed or attempted in [the arresting citizen's] presence." Cal.Penal Code § 837(1) (West 1985). "Public offense" is synonymous with "crime" and is defined as "an act committed or omitted in

violation of a law forbidding or commanding it, and to which is annexed, upon conviction, either of the following punishments: ... 2. Imprisonment; 3. Fine...." Cal.Penal Code § 15 (West 1988). Violation of the court injunction would have qualified as a "public offense," since under the contempt provisions in either the Code of Civil Procedure or the Criminal Code, the demonstrators could have been imprisoned or fined. *See* Cal.Penal Code §§ 13, 15, 166 (West 1988); Cal.Code Civ.Proc. §§ 178, 1207, 1218 (West Supp.1989).

Womancare argues, however, that because the Collins group's first argument for liability depended upon proving that Womancare's arrests *violated* the California citizen arrest statutes, the Collins group cannot argue that Womancare's actions were in fact undertaken *pursuant to* the statute. Interestingly, this very argument has long been rejected in a different context—where *state officers* defending against section 1983 actions assert nonliability because their acts violated state law. *See Monroe v. Pape*, 365 U.S. 167, 172–87, 81 S.Ct. 473, 476–84, 5 L.Ed.2d 492 (1961), *overruled on other grounds, Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941); *Home Telephone & Telegraph Co. v. Los Angeles*, 227 U.S. 278, 288, 33 S.Ct. 312, 315, 57 L.Ed. 510 (1913). As early as 1913, the Court in *Home Telephone* observed that "a state officer cannot on the one hand as a means of doing a wrong forbidden by the [Fourteenth] Amendment proceed upon the assumption of the possession of state power and at the same time for the purpose of avoiding the application of the Amendment, deny the power and thus accomplish the wrong." 227 U.S. at 288, 33 S.Ct. at 315. And in *Classic*, which involved the criminal counterpart of section 1983, the Court succinctly held that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." 313 U.S. at 326, 61 S.Ct. at 1043 (citations omitted). Indeed, to hold otherwise would insulate the most grievous wrongs perpetrated by state officials from the reach of section 1983.

The Court has made it clear, however, that this "abuse of authority" doctrine does not apply if the challenged action is one undertaken by a *private party* rather than a state official. *Lugar*, 457 U.S. at 940, 102 S.Ct. at 2755. *Lugar* involved a challenge to a Virginia statute which allowed a creditor to obtain from a court clerk a prejudgment writ of attachment upon *ex parte* petition. The Court held that "[w]hile private misuse of a state statute does not describe conduct that can be attributed to the State, the procedural scheme created by the statute obviously is the product of state action." 457 U.S. at 941, 102 S.Ct. at 2756. Thus, an allegation that *private* parties misused a Virginia attachment procedure could not state a claim under section 1983 because such private parties could not be considered acting under color of state law. In other words, by alleging an "unlawful" deprivation of their property under state law, the plaintiffs in *Lugar* were in effect

> say[ing] that the [defendants'] conduct ... could not be ascribed to any governmental decision; rather [defendants] were acting *contrary to the relevant policy articulated by the State.* Nor did they have the authority of state officials to put the weight of the State behind their private decision, *i.e.,* this case does not fall within the abuse of authority doctrine recognized in *Monroe v. Pape*, 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed. 2d 492] (1961). That [defendants] invoked the statute without the grounds to do so could in no way be attributed to a state rule or a state decision.

*Id.,* at 940, 102 S.Ct. at 2755 (emphasis added); *see also Flagg Brothers*, 436 U.S. at 176–78, 98 S.Ct. at 1743–45 (Stevens, J., dissenting) ("It is only what the State itself has enacted that [petitioners] may ask the federal court to review in a § 1983 case. If there should be a deviation from the state statute ... the defect could be remedied by a state court and there would be no occasion for § 1983 re-

lief."); *Civil Rights Cases,* 109 U.S. 3, 17, 3 S.Ct. 18, 26, 27 L.Ed. 835 (1883) ("[C]ivil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, unsupported by State authority in the shape of laws, customs, or judicial or executive proceedings. The wrongful act of an individual, unsupported by any such authority, is simply a private wrong, or a crime of that individual...."); *Ouzts v. Maryland National Insurance Co.,* 505 F.2d 547, 553–54 (9th Cir.1974) (en banc) (*Ouzts*) (bail bondsman who did not comply with state statute was not acting under color of state law), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1681, 44 L.Ed.2d 103 (1975); *Hassett v. Lemay Bank & Trust Co.,* 851 F.2d 1127, 1129 (8th Cir.1988) (private misuse of state statute by private actor not sufficient under section 1983); *Roudybush,* 813 F.2d at 177 (same); *Winterland Concessions Co. v. Trela,* 735 F.2d 257, 262 (7th Cir.1984) (same).

The Collins group's first theory of state action, which focuses on the citizen's arrests alone, fails to meet the *Lugar* test. Their challenge to the citizen's arrests based on a delegation by statute argument fails because their claim depends upon the violation of California's citizen's arrest statute. Under this scenario, it is clear that Womancare's actions "could not be ascribed to any governmental decision; rather [the Womancare employees] were acting contrary to the relevant policy articulated by the State." *Lugar,* 457 U.S. at 940, 102 S.Ct. at 2755; *see also Ouzts,* 505 F.2d at 553–54. Thus, the Collins group has failed to establish the first element necessary under the *Lugar* test.

The Collins group attempts to distinguish the present case from various cases discussed above on the grounds that California's citizen arrest statute protects public rather than private interests. There is indeed some support in the case law for this distinction. For example, in *Ouzts* we held that a bail bondsman does not exercise a "public function" because he "is in the business in order to make money and is not acting out of a high-minded sense of devotion to the administration of justice."

*Ouzts,* 505 F.2d at 555. However, the nature of the interest served by a statutory delegation of power is relevant only once the first *Lugar* prong has been satisfied. That is, only once it has been shown that a private party is acting in accordance with a state delegation of authority does it become relevant whether that delegation serves public or private interests. Not surprisingly, courts frequently consider the Collins group's public/private interest distinction in the course of analyzing whether a private party is exercising a public function. *See, e.g., San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 544, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 (1987) (*San Francisco Arts*) (rejecting argument that because United States Olympic Committee serves national interest, it therefore exercises a traditional exclusive sovereign function, and reasoning that "[t]he fact '[t]hat a private entity performs a function which serves the public does not make its acts [governmental] action'"), *quoting Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772; *Flagg Brothers,* 436 U.S. at 157–64, 98 S.Ct. at 1734–38 (discussing sovereign function argument); *Jackson,* 419 U.S. at 352–54, 95 S.Ct. at 454–55 (declining to extend public function doctrine to all those industries "affected with the public interest"). Since the Collins group's failure to establish the first *Lugar* prong makes it unnecessary to reach the "public function" argument, the Collins group's public/private interest argument is inapplicable.

Nor does the Collins group's reliance on the California Supreme Court case of *People v. Zelinski,* 24 Cal.3d 357, 155 Cal.Rptr. 575, 594 P.2d 1000 (1979), change our analysis. *Zelinski* held that private department store security guards who "conduct[ed] an *illegal search* ... while engaged in a statutorily authorized citizen's arrest" under Cal.Penal Code § 837 were engaged in state action. 24 Cal.3d at 367, 155 Cal.Rptr. 575, 594 P.2d 1000 (emphasis added). Although *Zelinski* involved challenges under both the federal and state constitutional provisions, its holding rested on article 1, section 13 of the California

Constitution. *Id.* at 366–68, 155 Cal.Rptr. 575, 594 P.2d 1000. Even if we were to read *Zelinski* as interpreting federal as well as state law, however, there are two reasons why we would not be bound by it. First, although we may look to state precedent if persuasive, the issue of what constitutes action under color of state law is ultimately one of federal, not state, law. *Gorenc,* 869 F.2d at 505. Second, insofar as *Zelinski* held that action by a private party pursuant to but in violation of a state statute *can* constitute state action, *Zelinski* directly conflicts with and is superseded by *Lugar.* Moreover, the continuing validity of *Zelinski* has been called into doubt by the enactment of Proposition 8, which amended California's Constitution to prohibit California courts, in the absence of express statutory authority, from "exclud[ing] evidence seized in violation of either the state or federal Constitution unless exclusion is compelled by the federal Constitution." *In re Lance W.,* 37 Cal.3d 873, 888, 210 Cal.Rptr. 631, 694 P.2d 744 (1985); *see* Cal. Const. art. I, § 28(d); *People v. Ornelas,* 205 Cal.App.3d 1406, 1411–12, 1413, 253 Cal.Rptr. 165 (1988). Thus, to the extent *Zelinski* expanded the concept of state action under the California Constitution beyond federal law, it was abrogated by Proposition 8.

### C.

We turn now to the Collins group's joint action theory, under which they contend that Womancare's employees acted jointly with parties who admittedly are state actors, namely San Diego police officers or the prosecutor. Unlike the arguments discussed in section II.B., this theory does not rest solely on the private actions of private parties. One way to establish joint action is to demonstrate a conspiracy. *Howerton,* 708 F.2d at 383. Here, however, there is no allegation of a conspiracy. *Cf. United Steelworkers of America v. Phelps Dodge,* 865 F.2d 1539 (9th Cir.1989) (en banc). Joint action also exists where a private party is "a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions." *Sparks,* 449 U.S. at 27–28, 101 S.Ct. at 186; *see also Price,* 383 U.S. at 794, 86 S.Ct. at 1157 ("To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.").

In a recent case, we observed that "[t]he joint action inquiry focuses on whether the state has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity....'" *Gorenc,* 869 F.2d at 507, *quoting Burton,* 365 U.S. at 725, 81 S.Ct. at 862. Joint action therefore requires a substantial degree of cooperative action. For example, in *Howerton,* we found joint action between a landlord, Gabica, and various police officers based on their sustained, joint efforts to evict Howerton, one of Gabica's tenants. 708 F.2d at 385. We were careful to limit our holding by observing:

> This case involves more than a single incident of police consent to "stand by" in case of trouble. Police were on the scene at each step of the eviction. Mr. Gabica testified that the police presence gave him the feeling he had the right to cut off the utilities. Moreover, the police officer actively intervened—he privately approached the Howertons and recommended that they leave the trailerhouse. An unsolicited visit by a police officer is hardly passive, or "merely standing by." There is also some indication that on another occasion, when Officer Baldwin responded to a call from Mrs. Gabica reporting a domestic disturbance at the Howerton residence, he inquired whether the tenants had found a new rental. The actions of Officer Baldwin created an appearance that the police sanctioned the eviction.

*Id.* at 384. Our holding in *Howerton* was therefore premised on the fact that the Gabicas "repeatedly requested aid by the police to effect the eviction, and the police intervened at every step." *Id.* at 385.

On the other hand, we have held that merely complaining to the police does not convert a private party into a state actor. *See Rivera v. Green*, 775 F.2d 1381, 1382–84 (9th Cir.1985), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1656, 90 L.Ed.2d 198 (1986); *see also Sykes v. State of California (Department of Motor Vehicles)*, 497 F.2d 197, 202 n. 3 (9th Cir.1974). Nor is execution by a private party of a sworn complaint which forms the basis of an arrest enough to convert the private party's acts into state action. *Sims v. Jefferson Downs Racing Association*, 778 F.2d 1068, 1078–79 (5th Cir.1985). The Tenth Circuit's two section 1983 cases involving citizen's arrests also provide useful guidance. In *Lee*, the private party, besides effecting the citizen's arrest, also transported the arrested party to the police station, attempted to persuade the police to file charges, and swore out a complaint against the arrested party. 820 F.2d at 1114. Nonetheless, the Tenth Circuit held that this did not constitute joint action. *Id.* at 1114–15. Similarly, in *Carey*, Continental's airport manager, Gilbert, called an airport security officer, helped to escort Carey to the airport security station, and ultimately signed a complaint charging him with trespassing. The Tenth Circuit reasoned that "Gilbert's complaining about Carey's presence to a Tulsa police officer who, acting within the scope of his statutory duties, arrested Carey after questioning him, does not, without more, constitute state action for which Gilbert can be held responsible." 823 F.2d at 1404 (citation omitted).

In light of the foregoing cases, we hold that the facts alleged by the Collins group fail as a matter of law to satisfy the joint activity test for state action under section 1983. The circumstances of this case simply do not establish that the state has " 'so far insinuated itself into a position of interdependence with [Womancare employees] that it must be recognized as a joint participant in the challenged activity.' " *Gorenc*, 869 F.2d at 507, *quoting Burton*, 365 U.S. at 725, 81 S.Ct. at 862. Indeed, virtually all of the circumstances of this case point to the opposite conclusion. First, it is undisputed that the impetus for

the arrests came from Womancare employees and not San Diego police officers. *See Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 717 (9th Cir.) (private Posse Comitatus not state actor in part because impetus for its conduct "was purely private, solely and exclusively from within the organization itself"), *cert. denied*, 454 U.S. 967, 102 S.Ct. 510, 70 L.Ed. 2d 383 (1981); *cf. Stypmann v. City and County of San Francisco*, 557 F.2d 1338, 1341–42 (9th Cir.1977) (finding joint activity between police and private towing company where, in accordance with statutory scheme, police officer "makes the initial determination that a car will be towed and summons the towing company [and] … designates the garage to which the vehicle will be towed"); *Goichman v. Rheuban Motors, Inc.*, 682 F.2d 1320, 1322 (9th Cir. 1982) (following *Stypmann* since here, too, the private towing company acts "at the behest of a police officer"). Indeed, the police officer attempted to *discourage* Womancare employees from making the arrests by warning them of the danger of civil liability for false arrest. Second, the police officer refused, after conducting an independent investigation, to arrest the protesters on his own authority. *See National Collegiate Athletic Association v. Tarkanian*, — U.S. —, 109 S.Ct. 454, 464 n. 16, 102 L.Ed.2d 469 (1988) (rejecting argument that National Collegiate Athletic Association and University of Nevada Las Vegas were "joint participants" because "the state and private parties' relevant interests do not coincide … [but] rather … have clashed throughout the investigation, the attempt to discipline Tarkanian, and this litigation."). Third, the Collins group has not disputed nor are there alleged any facts in opposition to Womancare's contention that the police maintained a policy of neutrality in the dispute. *See Carey*, 823 F.2d at 1404 (Carey presented no evidence from which court could infer a "prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police"); *Lee*, 820 F.2d at 1115 ("There is no suggestion in the record before us that there was any prear-

rangement between" the citizen and police officer); *White v. Scrivner Corp.*, 594 F.2d 140, 143–44 (5th Cir.1979). In short, there is no indication in the record that state agents failed to use independent judgment or in any way coerced or encouraged Womancare employees to effect the citizen's arrest. *See San Francisco Arts*, 107 S.Ct. at 2986 (United States Olympic Committee's choice of how to enforce its exclusive right to use word "Olympic" not a governmental decision since there was no evidence that federal government "coerced or encouraged" the Committee in exercise of this right; mere approval of or acquiescence in initiatives of Committee not enough); *id.* at 2986, *quoting Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) ("Most fundamentally, this Court has held that a government 'normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government].'"). The police officer's issuance of citations based on the citizen's arrests does not constitute joint action. Nor is there even an allegation that the prosecutor failed to exercise independent judgment in prosecuting the charges.

For the foregoing reasons, the interlocutory summary judgment is reversed. Because the resolution of the Collins group's false arrest count depended upon the earlier summary judgment, we remand this issue for retrial.

REVERSED AND REMANDED.