**William FIGUEROA et. al., Plaintiffs,**

v.

**Jorge FERNANDEZ et. al., Defendants.**

**Civil No. 94–2459 (HL).**

United States District Court,
D. Puerto Rico.

March 15, 1996.

Maria S. Kortright–Soler, San Juan, PR, for William Figueroa, Karen Molina, Alejandro Lamas, Carmen Santiago.

Rafael Perez–Bachs, McConnell Valdes, San Juan, PR, for Jorge Fernandez, Domingo Hernandez.

Francisco J. Colon–Pagan, San Juan, PR, for Asoc. De Residentes Mansiones Del Toa, Inc.

Jose R. Perez–Hernandez, Pierluisi & Mayol–Bianchi, Hato Rey, PR, for Angel Rodriguez.

## OPINION AND ORDER

LAFFITTE, District Judge.

Today the Court encounters an issue of first impression concerning a statute that has generated considerable debate in Puerto Rico and, predictably, will be studied by many more communities throughout the United States as the citizenry become more terrified of crime. The statute, passed on May 20, 1987, amended shortly thereafter on August 10, 1988, and known as Law No. 21, authorizes communities to control the access that residents and non-residents have to the public streets of their communities. As a result of this statute and the pervasive fear of crime, barricades blocking the entrances and the exits of neighborhoods, electronic "beepers" opening iron gates with the push of a button, intercoms permitting visitors to speak with residents, and armed guards making personal inquiries to visitors before permitting them to enter the community have become commonplace in Puerto Rico.

The two issues in this case arise directly out of these controversial changes that have sharply altered the way residents live in their community and interrelate with non-residents. The first issue involves a rare application of the *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936–937, 102 S.Ct. 2744, 2753–2754, 73 L.Ed.2d 482 (1982) dual inquiry of state action for private parties. The question is whether the residential association, its president, and its vice-president, the private actors who are enforcing the neighborhood's closed access system, are state actors whom Plaintiffs may sue under section 1983. The second issue involves the final defendant in this case, the Mayor of Plaintiffs' municipality. This question focuses on whether the Mayor violated one of Plaintiffs' clearly established constitutional freedoms prohibiting him from receiving qualified immunity and whether Plaintiffs have alleged a violation of a constitutional right upon which relief may be granted.

After a thorough review of Law No. 21 and Plaintiffs' amended complaint, the Court discusses each issue in sequential order. First, the Court concludes that *Lugar* precludes Plaintiffs from suing private parties for violating Law No. 21 under section 1983. Consequently, the Court grants the motion to dismiss the amended complaint against the residential association, its president, and its vice-president. Second, the Court finds that the Mayor has qualified immunity against Plaintiffs' claims for compensatory damages. Plaintiffs' claims for injunctive relief against the Mayor must also be dismissed for failure to state a cognizable constitutional claim

upon which relief may be granted. Accordingly, the Court grants the Mayor's motion to dismiss Plaintiffs' complaint.

## STANDARD OF REVIEW

■ The dispute before the Court arises out of (1) Defendants' motions to dismiss the complaint on the grounds that they are not state actors and, therefore, Plaintiff has failed to state a claim upon which relief may be granted and (2) the Mayor's motion for qualified immunity.[1] When deciding a Rule 12(b)(6) motion to dismiss, the Court assumes that Plaintiffs' allegations are true and draws all reasonable inferences from these asservations in their favor. *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 51 (1st Cir.1990). Although the Court will not credit bald assertions or mere specious allegations, it will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir.1991).

## THE CLOSED COMMUNITIES STATUTE

On May 20, 1987, the Puerto Rico Legislature passed Law No. 21 ("the Act" or "the Controlled Access Law") empowering residential associations with the ability to close off their neighborhoods to outsiders.[2] P.R.Laws Ann., tit. 23, § 64 et. seq. (1991). Appalled by the skyrocketing number of murders, assaults, and robberies, the Puerto Rico Legislature decided to arm its citizens with a weapon against crime. While passing the Act, the Legislature declared that the Controlled Access Law would help "fight against crime," "bring back the peace our people require," and reduce "the already overburdened surveillance duties rendered by the Puerto Rico Police." *Statement of Motives*, Act No. 21, May 20, 1987, 1987 Laws of P.R. 63.

After the Legislature amended the Act on August 10, 1988, Law No. 21 authorized the municipalities of Puerto Rico to grant neighborhoods permits to surround their communities with physical barriers. P.R.Laws Ann., tit. 23, § 64 (1991). The Act permits neighborhoods with either (a) one entrance/exit, or (b) more than one entrance/exit but without a street or pedestrian walkway connected to a second community to obtain permits so long as they meet four requirements.[3] *Id.*

First, the neighborhood must elect a council, board, or residential association to represent the community during the implementation of the Act. P.R.Laws Ann., tit. 23, § 64a(a) (1991). Second, the neighborhood can not house a building or facility owned by the Commonwealth of Puerto Rico or the municipalities "for the use and enjoyment of the general public." *Id.* at § 64a(b). The Act excludes schools, recreational parks, and community centers from this special protection. *Id.* These buildings or areas, although publicly owned, may be encompassed within a closed community. Third, at least three-fourths (¾) of the homes within the community must approve of the plan to close the community. *Id.* at § 64a(c). Finally, the community must bear the burden of financing the installation, the operation, and the maintenance of the system. *Id.* at § 64a(d).

In several sections of the statute, the Act forewarns the communities that the statute can not be used to shut out all non-residents from the neighborhood's public streets and public areas. Apparently, the Legislature recognized the dangers inherent in delegating the control of public sectors to municipal-

---

1. The Court shall treat the Mayor's request for qualified immunity as a motion to dismiss.

2. Law No. 21 is an outgrowth of an earlier act delegating to the communities a similar power to control outsider access to the neighborhoods. *See* P.R.Laws Ann., tit. 21 § 3457 (1988); *Caquias Mendoza v. Asociación de Residentes de Mansiones de Río Piedras*, 93 J.T.S. 127 at 11081 n. 1 (1993).

3. Under the Act, a land developer may close the community. P.R.Laws Ann. tit. 23, § 64 (1991). The Act describes the specific steps that the developer must follow to obtain a permit. P.R.Laws Ann. tit. 23, §§ 64b–1, 64d–1(a), 64d–2(a) (1991). The Court does not discuss these sections of the Act because they are not relevant to the issues in this case.

ities and residential organizations. The Act makes it clear that a neighborhood may not keep out people who wish to attend private schools, churches, hospitals, civic clubs, and other similar institutions located within the boundaries of the closed communities. P.R.Laws Ann. tit. 23, § 64b (1991). In addition, the physical barriers installed to prevent outsider access "must not constitute a physical or architectural barrier for disabled citizens." *Id.* Finally, in another section of the Act, the Legislature warns the communities that public employees must have free access to the area. P.R.Laws Ann. tit. 23, § 64c (1991).

In spite of the fact that the Act requires residents of the closed community to pay for the installation and the maintenance expenses proportionally, the statute clearly recognizes that not all residents will embrace the enclosure of their neighborhood. P.R.Laws Ann., tit. 23, § 64d–3 (1991). The Act provides an out card for those residents who object to the system and refuse to bind themselves in a written contract to make payments for the system. Residents who oppose the closed community are exempted from paying fees for its installation, operation, maintenance, and removal. P.R.Laws Ann., tit. 23, § 64g (1991).

The Puerto Rico Planning Board ("Board"), authorized to adopt regulations to implement the Act, fortified an opponent's right of free access to the closed community. P.R.Laws Ann. tit. 23, § 64e (1991). The Board's regulation requires that the neighborhoods guarantee residents who oppose the Act free and equal access to the system. *Caquías Mendoza v. Asociación de Residentes de Mansiones de Río Piedras*, 93 J.T.S. 127 at 11073, 11082 n. 7 (1993). On January 5, 1989, the Governor of Puerto Rico issued an Executive Order approving the Board's measure and, thereby, bolstering the opponent's right of free and equal access to his or her community. *Id.*

On August 25, 1993, in a crucial Puerto Rico Supreme Court opinion, *Caquías Mendoza v. Asociación de Residentes de Mansiones de Río Piedras*, 93 J.T.S. 127 at 11068

(1993), the Court fleshed out the scope and application of the Act's provisions. The residents of several communities in *Caquías Mendoza* opposed the closing of their respective communities and refused to pay the monthly fee for the electronic "beeper" and the keys for the pedestrian walkway. Some of the residents only had access to their homes through an entrance controlled by a twenty-four hour guard. Because they refused to pay, the residential associations did not provide them with these mechanisms to enter certain entrances and walkways of their respective neighborhoods. When the residential association sued them for not paying for the maintenance of the system, the residents responded by suing the association. The residents asked the Court, *inter alia*, to declare the Controlled Access Law unconstitutional, find that the residential association violated the Act, or, in the alternative, require the association to provide them with free access to their communities. *Id.* at 11073–74.

After a careful analysis of the Act, the Court concluded that the opponents of the system had the right to receive the electronic "beepers" and the keys even though they never paid for them. Moreover, the Court held that the opponents had the same rights to use the system and the public areas within the community as the residents who continue to pay for its maintenance. *Id.* at 11078. The Court recognized that many residents would find this dichotomy unfair and unjust. Some proponents of the system, in fact, may publicly voice their opposition to its installation in order to avoid paying any fees. However, the Court pointed out that this seemingly unfair consequence is the result of a careful balancing of all the residents' interests. *Id.* Therefore, pursuant to Law No. 21, any attempt to deny an opponent and resident of a closed community equal and free access to the system is a violation of the law. Having resolved this dispute and finding an absence of factual information in the record, the Court avoided resolving the constitutional questions and remanded the case for further proceedings. *Id.* at 11079–80.[4]

---

4. Two Puerto Rico Supreme Court Justices, Justice Antonio S. Negron Garcia and Justice

Francisco Rebollo Lopez, filed separate opinions expressing their belief that Law No. 21

## THE PRESENT DISPUTE

Plaintiffs, William Figueroa, Karen Molina, Alejandro Lamas, and Carmen Santiago, are residents of Mansiones del Toa in Toa Baja, Puerto Rico. They are the owners of a home that borders on a public street. When Plaintiffs first moved into the community, there were no community barriers preventing access to the streets. Plaintiffs are well-known opponents of Law No. 21 and closed communities. When their community formed a residential association called Asociación de Residentes Mansiones del Toa, Inc ("Asociación") for the purpose of closing the community, Plaintiffs voiced their objections to the system.

The community, however, rebuffed Plaintiffs' disapprobation. Plaintiffs found that their views were in the minority. Over seventy-five percent (75%) of the community voted to petition the municipality of Toa Baja for the authority to close their community. On March 2, 1992, the Mayor of Toa Alta, Angel Rodríguez Cabrera, granted their petition. Two years later, in July 1994, Plaintiffs' neighbors closed the community. Now, an iron gate blocks the public's previously unrestricted access to the community. Only those residents with electronic "beepers" may enter and leave the single entrance to the community. An iron gate also blocks the pedestrian walkways leading into the community. Only those residents with a key may freely walk into the neighborhood. The residents which supported the system pay a monthly charge for the installation, maintenance, the "beeper," and the key. The residents, like Plaintiffs, who opposed the system receive the "beeper" and the key for free.

Visitors to the community may contact a resident by using the intercoms located at the entrance. The intercom system was never a part of the original plan to control access to the community. The President of the Asociación, Jorge Fernández, and the Vice-President of the Asociación, Domingo Hernández, required all the residents to pay a monthly charge for the use of an intercom. When Plaintiffs refused to pay, the Asociación denied them access to the intercom system. As a consequence, Plaintiffs' family members, Plaintiffs' friends, religious solicitors, commercial door-to-door salesmen, and individuals delivering goods or packages can not contact Plaintiffs at the entrance of the community. Plaintiffs must either wait at the entrance to permit their visitors entry into the neighborhood or hope that the visitor will gain access by using the intercom of another resident.

Without free access to an intercom, Plaintiffs found living in the closed community unbearable. They contacted the President and the Vice–President of the Asociación repeatedly to complain. Instead of resolving the situation, these meetings only aggravated the problem. Undaunted, Plaintiffs approached the Mayor of Toa Alta for assistance. Plaintiffs pleaded their case to the Mayor reminding him that their elderly and handicapped relatives could not visit Plaintiffs unannounced at any time of the day or the night without access to the intercom. The Mayor, Plaintiffs claim, refused to heed Plaintiffs' grievance. According to Plaintiffs, he suggested that Plaintiffs' relatives push the intercom buttons of all the residents until one of the neighbors permitted them to enter the community.

Not only do Plaintiffs refuse to pay for the intercoms, Plaintiffs also find the rules and regulations of the controlled access system objectionable. According to the rules, it is the responsibility and the obligation of each resident to impede a stranger's entrance into the community. Plaintiffs, therefore, must refuse to open the gate to all interlopers, newcomers, transients, and unknown visitors to the community. Plaintiffs object to the Asociación's rules on both ideological and constitutional grounds.[5]

Plaintiffs filed the present suit under section 1983. Plaintiffs do *not* challenge the constitutionality of Law No. 21. Instead,

---

was constitutional on its face. *Caquías Mendoza,* 93 J.T.S. at 11084–11087, 11091–11101.

**5.** This claim does not appear in Plaintiffs' amended complaint. Plaintiffs make this addi-tional argument in the memorandum of law that they submitted to the Court. *See* Mem. In Compliance With Ct. Order, Dkt. No. 32, at 11.

Plaintiffs argue that the private parties, the Asociación, its President, and its Vice–President, are violating Law No. 21 intentionally by refusing to provide them with an intercom. *See* Pls.' Am.Compl., ¶'s 4, 14, 15, 17, 18, 19, 22, 26, 27. According to Plaintiffs, Defendants' implementation of Law No. 21 has converted their membership in a community, where the public has free access to the streets, into a condominium, where outsiders may only enter with the permission of a resident. In addition, Plaintiffs accuse the Mayor of refusing to intervene on their behalf and make a vague, conclusory allegation that the Mayor has delegated powers improperly to the Asociación. *Id.* at ¶'s 6, 20.[6]

Accordingly, Plaintiffs argue that Defendants have denied them (1) the freedom to enjoy their property in violation of the Due Process Clause of the Fifth and Fourteenth Amendments, (2) the freedom to receive information from commercial salesmen, religious solicitors, and other visitors in violation of the First Amendment, (3) the freedom of third-parties to speak and express themselves in their neighborhood's public streets in violation of the First Amendment, (4) the freedom to associate with their friends and their relatives who wish to visit them unannounced in violation of the First Amendment, (5) the freedom to assemble with visitors in violation of the First Amendment, (6) the freedom to practice their religion by impeding religious meetings with their fellow parishioners and by hindering the religious beliefs of third-parties also in violation of the First Amendment, and (7) the freedom to enjoy their property, their community, and the public streets on an equal playing field with their neighbors in violation of the Equal Protection Clause of the Fifth and Fourteenth Amendments.

On the basis of these alleged violations of the Constitution, Plaintiffs are requesting free access to the intercoms in the form of injunctive relief, at least twenty-five thousand dollars in compensatory damages for their mental pain and suffering, an unspeci-fied amount of punitive damages, and attorney's fees.

## DISCUSSION

### A. STATE ACTION

Section 1983 is the chief statutory apparatus for individuals seeking to redress violations of their constitutional freedoms by people acting pursuant to state government authority. *See* 42 U.S.C.A. § 1983 (1994). It was designed "to give a broad remedy for violations of federally protected civil rights." *Monell v. Department of Social Services of the City of N.Y.*, 436 U.S. 658, 685, 98 S.Ct. 2018, 2033, 56 L.Ed.2d 611 (1978). The statute's importance in preventing continuing violations of constitutional freedoms and compensating individuals for these transgressions should not be underestimated. It has quickly become the most popular vehicle for preserving one's constitutional freedoms. *See* Erwin Chemerinsky, *Federal Jurisdiction* § 8.2 at 428 (2d ed. 1994).

Plaintiffs are attempting to sue three private parties, the Asociación, its President, and its Vice–President, and one government official, the Mayor of Toa Alta, under section 1983. All four Defendants have moved to dismiss the complaint on the grounds that the alleged violations of Plaintiffs' constitutional freedoms have been committed by private parties. In their respective motions to dismiss and Plaintiffs' opposing briefs, both sides concentrate on whether Plaintiffs have sued individuals acting "under color of state law" according to one of four established tests, the state compulsion test, the nexus test, the joint action test, and the public function test. *See Rockwell v. Cape Cod Hospital*, 26 F.3d 254 (1st Cir.1994) (reviewing the Supreme Court's "under color of state law" tests).

All parties, however, have overlooked that the section 1983 "state action" test involves a dual inquiry. In this case, the first part of the inquiry is dispositive and the Court does

---

6. For the purposes of resolving this motion only, the Court assumes that Plaintiffs' allegations are true. The Court assumes that the Asociación, its President, and its Vice–President are violating Law No. 21 and that the Mayor is silently sup-porting the violations. The Court, however, intimates no view as to whether Law No. 21 requires the Asociación to provide the opponents of closed communities with free and equal access to the intercom system.

not reach the question of whether the private parties are acting "under color of state law." In *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936–937, 102 S.Ct. 2744, 2753–2754, 73 L.Ed.2d 482 (1982), the Supreme Court announced that the two-part test incorporates both a "state action" component and an "under color of state law" component.

■ Under the first prong of the test, Plaintiffs must demonstrate that Defendants deprived them of a right, privilege, or immunity secured to them by the Constitution. Plaintiffs' allegations under both the First Amendment and the Fifth Amendment, incorporated through the Fourteenth Amendment and applicable to the states, may only be brought against the acts of a state. *Rendell–Baker v. Kohn*, 457 U.S. 830, 837, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982). "[T]he deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753. The Supreme Court has labeled this part of the inquiry the "state action" test. *Id.* at 935–936 n. 18, 102 S.Ct. at 2752–2753 n. 18. Under the second prong of the inquiry, Plaintiffs must demonstrate that Defendants were acting "under color of state law." The Supreme Court has developed four tests, upon which Plaintiffs and Defendants concentrate their arguments, to determine if parties may "fairly be said to be a state actor." *Id.* at 937, 102 S.Ct. at 2753.

■ The first part of the inquiry is only applicable when the plaintiff is suing a private party under section 1983. A state official who abuses his or her authority and, therefore, violates state law may still be found liable under section 1983. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). When the plaintiff sues a state official, the dual inquiry collapses into one. *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753. In contrast, when the plaintiff sues a private party, the first part of the inquiry becomes a critical component of the suit. *Id.* On the one hand, if the private party is acting pursuant to some state law, some state rule of conduct, or state authority, there is "state action" and that party is subject to suit un-

der section 1983. *See, e.g., Georgia v. McCollum*, 505 U.S. 42, 51, 112 S.Ct. 2348, 2354, 120 L.Ed.2d 33 (1992) (defendant's use of peremptory challenges pursuant to state law constitutes "state action"). On the other hand, if the private party is abusing state authority, violating state law, or ignoring state rules of conduct, there is no "state action" and the private party can not be sued under section 1983.

In *Lugar*, for example, the "state action" prong affected the outcome because the plaintiff sued private parties for misusing Virginia's prejudgment attachment statute. The plaintiff, a debtor, sued his creditor (1) in count two for unlawfully attaching his property under the statute and (2) in count three for using an unconstitutional attachment procedure that deprived the debtor of his property. *Id.* at 924, 102 S.Ct. at 2747. The Court distinguished between these two counts of the complaint and quickly dismissed count two. The debtor's allegation, even if true, that the creditor used the state attachment procedure in an unlawful manner failed to meet the "state action" requirement. *Id.* at 940, 102 S.Ct. at 2755. "[P]rivate misuse of a state statute does not describe conduct that can be attributed to the State...." *Id.* at 941, 102 S.Ct. at 2755. Conversely, the Court permitted the debtor to proceed with count three because an allegation that the private party acted pursuant to an unconstitutional statute was not private action but "state action." *Id.* In the latter case, the private party was obeying state law.

Since the Supreme Court decided *Lugar* in 1982, several courts have dismissed section 1983 lawsuits that alleged mere misuse of a state statutory proceeding. *See, e.g., Jones v. Poindexter*, 903 F.2d 1006, 1010–11 (4th Cir.1990) (private party misuse of state process to enforce judgments); *Roudybush v. Zabel*, 813 F.2d 173, 177 (8th Cir.1987) (private party violation of post-judgment procedural statute); *Dahlberg v. Becker*, 748 F.2d 85, 90–91 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985) (private party's intentional violation of New York's contempt law); *Winterland Concessions Co. v. Trela*, 735 F.2d 257, 262 (7th Cir.1984) (private party misuse of state sei-

zure statute); *Loyd v. Loyd,* 731 F.2d 393, 398–399 (7th Cir.1984) (private party misuse of statutory probate procedures).

Although Plaintiffs' complaint does not involve the misuse of a state statutory proceeding, the *Lugar* "state action" prong has been applied in cases more analogous to Plaintiffs' circumstances. Perhaps the best example of such a case is *Collins v. Womancare,* 878 F.2d 1145 (9th Cir.1989), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990). In *Collins,* the employees of a women's health care center arrested a group of antiabortion protesters picketing outside their offices. The employees detained the protesters pursuant to California's citizen's arrest statute. After the criminal charges against the picketers were dismissed, the protesters filed a section 1983 lawsuit against the health care center and its employees. They alleged, *inter alia,* that the private parties acted contrary to the state's citizen's arrest law, the private parties were performing traditionally exclusive public functions, and requested compensatory relief. *Id.* at 1145–47.

The Ninth Circuit Court of Appeals never reached the question of whether the private parties were acting under color of state law while performing a traditional public function. Instead, the Court relied on the first prong of *Lugar.* It found that the protesters were only alleging that the clinic employees were violating California's citizen's arrest statute. Because mere misuse of the state statute by private parties did not constitute "state action," the Court dismissed the protesters' complaint.

The Second Circuit Court of Appeals, also applying the first prong of *Lugar,* reached a very similar result. In *Albert v. Carovano,* 851 F.2d 561, 563 (2d Cir.1988) (*en banc*), a group of students of Hamilton College, who were suspended for occupying the college's main administration building, filed a section 1983 suit against the College, its President, and its Dean of Students. The students alleged that these defendants were state actors because they acted pursuant to state disciplinary rules that the College had to adopt under New York's Henderson Act. The Court, however, disagreed. It found that the state statute was silent regarding the conduct that constitutes a breach of the public order and the form of discipline for any breach. *Id.* at 570–71. Consequently, when the school officials suspended the students, they were not acting pursuant to a state rule of conduct, state law, or state policy. *Id.* at 568. Rather, their actions were entirely disconnected from the state.

■ Plaintiffs' complaint must be evaluated in light of *Lugar, Collins,* and *Albert.* Their allegations against the Mayor, a state official, are subject to a different analysis than their asseverations against the private parties, the Asociación, its President, and its Vice–President. Their allegations against the Mayor satisfy both prongs of the *Lugar* test: the "state action" prong and the "under color of state law" prong. As stated previously, the test collapses into one inquiry. Plaintiffs' allegation that the Mayor abused his authority under Law No. 21 by delegating powers improperly under the Act and by failing to intervene on Plaintiffs' behalf meets both prongs of the test.

■ Plaintiffs' claims against the private parties are a different matter. Plaintiffs never attack the constitutionality of Law No. 21. In fact, by suggesting that the private parties are violating the Act, they implicitly recognize the validity of the Controlled Access Law. What Plaintiffs assert is that the private parties are implementing Law No. 21 in an unlawful manner. Plaintiffs are demanding the same free access to the intercom that they receive with the electronic "beeper" and the keys to the pedestrian walkway. Furthermore, Plaintiffs argue that the Asociación's rules requiring them to keep strangers out of the community violate the Act.

Their complaint resembles count two of the debtor's complaint in *Lugar,* the protesters' allegations in *Collins,* and the students' asseverations in *Albert.* In all three cases, the plaintiffs were attempting to use section 1983 to seek relief for private parties' violations of state law. In the present case, the Asociación's acts, along with the conduct of its President and its Vice–President, are analogous to the alleged unlawful use of the

prejudgment attachment proceeding in *Lugar*, the improper use of the state's citizen's arrest statute in *Collins*, and the misuse of the disciplinary measures required by state law in *Albert*.

Plaintiffs never assert that the Asociación, its President, or its Vice–President denied them intercoms pursuant to Law No. 21, the Puerto Rico Supreme Court decision in *Caquías*, or some state rule of conduct or policy. Nor do they assert that the Act requires the residents to keep strangers out of their community. Rather, Plaintiffs allegations indicate that the parties acted alone without legal guidance from the state. For example, in their amended complaint, Plaintiffs state: "Defendants Jorge Fernandez and Domingo Hernandez have both decided that to be connected to the only system that allows visitors to communicate with residents is a privilege reserved for only those who pay monthly fees...." Pls. Amended Compl., ¶ 14. Plaintiffs imply that these Defendants are acting outside the boundaries of the law. A few pages later, Plaintiffs accuse the private parties of using other illegal state procedures to deny them access to the intercom. Plaintiffs state: "Defendants Fernández and Hernández, in their zeal to prevent plaintiffs from their rights have gone as far as arranging for the secret recording of a meeting of the parties with the sole purpose of violating plaintiffs rights and definitely preventing connection to the intercom system." *Id.* at ¶ 18.

A telltale sign that Plaintiffs are merely alleging a misuse of the Controlled Access Law is their failure to attack the constitutionality of the law on its face. In the amended complaint, Plaintiffs never request injunctive relief against the implementation of Law No. 21 or declaratory relief that the Act is unconstitutional. Instead, Plaintiffs focus on relief that forces the private parties to provide them free access to the intercom system.

If the Court reached any other result and permitted Plaintiffs to establish a section 1983 claim against private parties for violating Law No. 21, the doors to the federal court would be wide open to all kinds of private disputes involving the Controlled Access Law. Anytime a residential association or its members denied a resident the use of a "beeper," the use of the walkway keys, or access to a particular public area within the closed community, the dispute could enter the federal court through section 1983. Such a deluge of disputes unconnected to the state was never the intention of section 1983 litigation and the *Lugar* decision precludes this result.

Consequently, the Court grants the motions to dismiss filed by the Asociación, its President, and its Vice–President on the grounds that Plaintiffs have failed to state a claim under section 1983 upon which relief may be granted. Plaintiffs' complaint against these private parties for allegedly violating Law No. 21 is hereby dismissed.

## B. QUALIFIED IMMUNITY AND FAILURE TO STATE A CLAIM:

The Court's dismissal of the complaint against the private parties leaves Plaintiffs' final allegations against the Mayor of Toa Alta remaining. Broken down, Plaintiffs complaint against the Mayor falls into two distinct claims. First, they allege in a vague and conclusory manner that the Mayor delegated his authority improperly to the private parties. Plaintiffs never develop this allegation by filling in material information such as how, why, or what powers were delegated improperly. Second, they argue that the Mayor violated their constitutional freedoms by failing to intervene on their behalf and by failing to prevent the private parties from violating Law No. 21 and their constitutional freedoms.

■ In response, the Mayor has moved to dismiss these claims for lack of state action and on the grounds of qualified immunity. Applying the dual inquiry of *Lugar*, the Court has concluded already that the Mayor is a state actor who may be sued under section 1983. That leaves the Mayor's qualified immunity defense. In *Harlow v. Fitzgerald*, 457 U.S. 800, 814–19, 102 S.Ct. 2727, 2736–2739, 73 L.Ed.2d 396 (1982), the Supreme Court established an objective test to determine whether an official has qualified immunity. "[G]overnment officials perform-

ing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738.

■ Naturally, Plaintiffs must assert a violation of a clearly established constitutional right before they can even begin to defeat the Mayor's motion for qualified immunity. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); *Souza v. Pina,* 53 F.3d 423 (1st Cir.1995). "The right must be stated with particularity.... Otherwise, as the Supreme Court has observed, the generality at which courts identify the 'clearly established' legal right threatens to 'convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging a violation of extremely abstract rights.'" *Souza,* 53 F.3d at 425 (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)).

■ Both of Plaintiffs' claims seeking *compensatory damages* from the Mayor fail to allege a violation of a clearly established constitutional right. Plaintiffs' allegation that the Mayor delegated powers improperly under Law No. 21 is vague and conclusory. Even a liberal reading of this claim leads to confusion and obfuscation regarding what Plaintiffs' claim entails. First, it is unclear that the Mayor has any powers to delegate under the Act itself. The Act is silent regarding the Mayor's role in the implementation of a closed community. Second, even if the Act required the Mayor to delegate powers, Plaintiffs fail to elaborate on what powers the Mayor delegated improperly. "Despite the highly deferential reading ... we need not credit bald assertions, periphastic circumlocutions, unsubstantiated conclusions, or outright vituperation." *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 51 (1st Cir.1990). Plaintiffs first allegation is simply a legal conclusion without any factual explanation or support. *See Boston & Maine Corp. v. Town of Hampton,* 987 F.2d 855, 863–67 (1st Cir.1993) (summarizing the scope of particularity required in pleadings); *Resolution Trust Corp. v. Driscoll,* 985 F.2d 44, 48 (1st Cir.1993) ("one conclusory sentence" regarding defendant's wrongful acts insufficient to pass muster on a motion to dismiss). The Mayor, therefore, is entitled to qualified immunity against this nebulous and abstract claim.

■ That leaves Plaintiffs' final claim that the Mayor failed to intervene and prevent the private parties from denying them an intercom in violation of Law No. 21.[7] The Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) forecloses Plaintiffs from seeking relief for this claim. In *DeShaney,* a minor child and his mother sued the state social service agency and its employees for failing to protect the child from his father's severe child abuse. The Court found that the complaint failed to state a recognizable constitutional claim. The Court held that, absent special circumstances, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195, 109 S.Ct. at 1003. *See also Martinez v. Colon,* 54 F.3d 980, 986 (1st Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995) (emphasizing that state officials normally have no constitutional obligation to intervene on behalf of private parties); *Arroyo v. Pla,* 748 F.Supp. 56, 60 (D.P.R.1990) (same). Having found that the Asociación, its President, and its Vice–President are private actors for the purposes of section 1983 litigation, the *DeShaney* principle presents an insurmountable obstacle to Plaintiffs' claims for relief against the Mayor.

■ Plaintiffs want to hold the Mayor liable for constitutional violations allegedly committed by private actors. Plaintiffs argue that the Mayor refused to help them and, in fact, recommended that relatives of Plaintiffs push the intercoms of other resi-

---

**7.** Plaintiffs do not allege that the Mayor violated any specific constitutional provision by failing to intervene. The Court, however, chooses to read Plaintiffs' complaint liberally to allege that the Mayor violated their rights under the Due Process Clause of the Fourteenth Amendment.

dents in order to gain access to the community. In short, Plaintiffs assert that the Mayor should be liable for failing to stop private actors from denying them their constitutional freedoms, including their liberty and property interests under the First and Fourteenth Amendments. The Supreme Court, however, found that neither the constitutional language nor history "support such an expansive reading of the constitutional text." *DeShaney,* 489 U.S. at 195, 109 S.Ct. at 1003. The purpose of the Due Process Clause of the Fourteenth Amendment was "to protect people from the State, not to ensure that the State protected them from each other." *Id.* at 196, 109 S.Ct. at 1003.

None of the exceptions to this general rule are applicable to Plaintiffs' case. Plaintiffs neither allege nor could they allege that they were under the custody of the Mayor. *Id.* at 199–200, 109 S.Ct. at 1005–1006. The Mayor was never responsible for their daily care or well-being. Furthermore, Plaintiffs do not argue that the Mayor's actions made them more vulnerable to the private parties' conduct. *Id.* at 201, 109 S.Ct. at 1006. At worst, the Mayor knew that the private parties were violating Law No. 21 and silently supported their actions. This conduct, however, does not consist of the types of "affirmative acts" that rise to the level of a constitutional obligation. *See Souza,* 53 F.3d at 427 (1st Cir.1995) (chief prosecutor's public accusations that Degrazia committed the nine highway murders may have led directly to his suicide but are not the types of "affirmative acts" that give rise to constitutional duty); *see also Monahan v. Dorchester Counseling Center, Inc.,* 961 F.2d 987, 993 (1st Cir.1992) (state transportation of mentally ill patient who jumps out of van is not the type of "affirmative act" rising to the level of a constitutional obligation). Consequently, Plaintiffs' accusation that the Mayor failed to intervene, even if true, fails to allege a violation of a clearly established constitutional right.

■ Although the Mayor is entitled to qualified immunity against Plaintiffs' claims for compensatory damages, Plaintiffs are also seeking equitable relief. Plaintiffs want free access to the intercom system. Qualified immunity is unavailable for state officers, like the Mayor, seeking immunity from claims for injunctive relief. *Lugo v. Alvarado,* 819 F.2d 5, 7 (1st Cir.1987). Consequently, the Mayor may be amenable to suit on the claims for equitable relief unless Plaintiffs have failed to even state a cognizable constitutional claim upon which relief may be granted.

■ For exactly the same reasons explained above, the Court finds that Plaintiffs have indeed failed to allege a cognizable constitutional violation. Neither Plaintiffs' enigmatic and hazy claim that the Mayor delegated powers unlawfully nor Plaintiffs' claim that the Mayor failed to intervene on their behalf alleges a violation of any recognizable constitutional right upon which relief may be granted.[8] Consequently, Plaintiffs' equitable claims against the Mayor must also be dismissed.

## CONCLUSION

Under the first prong of the state action test in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), Plaintiffs may not file a section 1983 action against private parties for violating state law. Accordingly, Plaintiffs' complaint against the Asociación, its President, and its Vice–President for allegedly violating Law No. 21 is hereby dismissed with prejudice. In addition, Plaintiffs' compensatory damage claims against the Mayor fail to allege a violation of a clearly established constitutional right. On these claims, the Mayor is protected by qualified immunity. The Court also dismisses Plaintiffs' equitable claims against the Mayor because these same claims fail to allege a violation of a constitutional right upon which relief may be granted.

---

**8.** To the extent that Plaintiffs are seeking injunctive relief against the Mayor relying entirely upon Law No. 21, *Pennhurst State School Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) bars Plaintiffs' claim. In *Pennhurst,* the Supreme Court held that the granting of injunctive relief against state officials for violating state law "does not vindicate the supreme authority of federal law." *Id.* at 106, 104 S.Ct. at 911. Such a suit in federal court is really an action against the state itself and, therefore, prohibited by the Eleventh Amendment.

Plaintiffs' complaint against the Mayor, therefore, is dismissed with prejudice.

**IT IS SO ORDERED.**